[No. S046375. Aug. 18, 1997.]

JAMES BUTTRAM, Plaintiff and Respondent, v.
OWENS-CORNING FIBERGLAS CORPORATION, Defendant and
Appellant.

**COUNSEL**

Wright, Robinson, McCammon, Osthimer & Tatum, Wright, Robinson, Osthimer & Tatum, James C. Nielsen, Thomas H. Nienow, Gibson, Dunn & Crutcher, Jerry Fowler, Jr., and Larry L. Simms for Defendant and Appellant.

Morgenstein & Jubelirer, Eliot S. Jubelirer, Lee Ann Huntington, Bruce A. Wagman, Landels, Ripley & Diamond and Sanford Svetcov as Amici Curiae on behalf of Defendant and Appellant.

Bryce C. Anderson, Kazan, McClain, Edises, Simon & Abrams, Dianna Lyons and Denise Abrams for Plaintiff and Respondent.

Wartnick, Chaber, Harowitz, Smith & Tigerman, Harry F. Wartnick and Madelyn J. Chaber as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

BAXTER, J.—

### I. *Introduction.*

Defendant and appellant Owens-Corning Fiberglas Corporation (OCF) appealed from a products liability judgment in the amount of $1,519,475 entered against it in a trial involving plaintiff and respondent James Buttram's exposure to OCF's asbestos-containing products and his consequent contraction of pleural mesothelioma, an asbestos-caused form of lung cancer. In an order filed on October 17, 1996, we designated this matter the lead case for deciding the issue of when a cause of action seeking damages for personal injuries resulting from a latent disease such as asbestos-related mesothelioma accrues for purposes of determining whether the provisions of Proposition 51 can be prospectively applied.

Proposition 51, effective June 4, 1986, modified the common law rule of joint and several liability by limiting a tortfeasor's liability for *noneconomic damages*[1] *to the proportion of such damages equal to the tortfeasor's own percentage of fault. In Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1193-1194, 1205 [246 Cal.Rptr. 629, 753 P.2d 585] (*Evangelatos*), we held Proposition 51 prospective only and applicable only to causes of action "accruing" on or after its effective date. (See Civ. Code, § 1431.2.)

In a posttrial motion, OCF argued Proposition 51 should be applied to this case to limit its liability for plaintiff's award of noneconomic damages ($450,000) to the proportion of such damages equal to its own percentage of fault. The trial court determined that because plaintiff's medical testimony established that undetected cancer cells in probability had started forming by 1984, two years prior to the effective date of Proposition 51, plaintiff's cause of action for injuries arising from pleural mesothelioma "accrued" prior to the initiative measure's effective date. The trial court therefore ruled Proposition 51's tort reform measures inapplicable to this case, leaving OCF jointly and severally liable for the entire award of noneconomic damages.

The Court of Appeal affirmed, concluding that for purposes of determining whether Proposition 51 applied, plaintiff's cause of action for damages resulting from the latent asbestos-related disease mesothelioma accrued

---

[1]Noneconomic damages are defined as "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2).)

"when he suffered some sort of appreciable, meaning compensable, harm or injury." Under the Court of Appeal's test, subclinical (i.e., undiscovered and unmanifested) cellular changes, such as development of the first cancer cell, constitute the "appreciable harm" that triggers accrual of a cause of action for Proposition 51 purposes in the latent disease context. It matters not that plaintiff did not suffer any actual symptoms of the disease, was unaware he would contract the disease, and was not diagnosed with the disease at the time the undetected cellular changes first occurred. Under the rationale of the Court of Appeal's holding, as long as plaintiff's medical experts can establish, in retrospect, that such subclinical cellular changes began forming at some time prior to the effective date of Proposition 51, the initiative's tort reform measures are rendered inapplicable in a case involving latent injuries.

For the reasons explained below, we reject the Court of Appeal's test for determining when a plaintiff's cause of action accrues for purposes of applying Proposition 51 in the latent disease context. We hold instead that a cause of action for damages arising from the latent and progressive asbestos-related disease mesothelioma has "accrued"—for purposes of determining whether Proposition 51 can be prospectively applied consistent with the rationale of this court's holding in *Evangelatos, supra,* 44 Cal.3d 1188—if the plaintiff was diagnosed with the disease for which damages are being sought, or otherwise discovered his illness or injuries, prior to Proposition 51's effective date of June 4, 1986.

## II. *Factual and Procedural Background.*

Since OCF did not challenge the sufficiency of the evidence to support the liability or damage verdicts in issue on appeal, we need not review the voluminous record in great detail. The following salient facts were found relevant to the Proposition 51 "accrual" issue by the Court of Appeal.

Plaintiff is a Vietnam veteran who served from 1964 to 1968 in the United States Navy. He was assigned to the destroyer U.S.S. Mullaney and, both while the ship was in dry dock for repairs and during its active service in Vietnam, frequently worked in the ship's boiler room. The boilers and steam pipes in the boiler room were all insulated with asbestos, and plaintiff was present in that room when the insulation was both being removed and repaired. Also, when the ship was conducting shore bombardment off the coast of Vietnam during its active service, vibration from the ship's guns caused breaks in the asbestos insulation and pipes in the boiler room, which plaintiff would also have to repair.

After plaintiff left the Navy in 1968, he had no further work with or exposure to asbestos-containing materials. Commencing in 1978, he worked

as a maintenance mechanic with a chemical manufacturer. In 1991, at age 47, he had a routine annual physical examination which included a chest X-ray that revealed a problem with one of his lungs. After a series of tests at Kaiser Hospital, a biopsy revealed he had contracted pleural mesothelioma. He was advised there was no cure for this disease, and he would eventually die from it.

Subsequently, plaintiff had a lung removed, was given electric shock therapy to slow down his heart rate, and underwent chemotherapy. He filed suit on July 2, 1992, and several months later the trial court granted his motion for trial preference under Code of Civil Procedure section 36. Settlements were effectuated with several named defendants soon thereafter, and a trial as to OCF followed the next year.

In pretrial motions, OCF argued Proposition 51 should apply to the case. Plaintiff in turn urged that the initiative measure did not apply because both the wrongful conduct and the early stages of his injury predated Proposition 51's effective date. Plaintiff agreed to proceed to trial as though Proposition 51 applied, reserving the issue for a posttrial ruling.

After a bifurcated trial (phase I addressing causation and compensatory damages, phase II addressing exposure and liability issues), the jury returned a verdict in plaintiff's favor and awarded him damages totaling $1,519,475. Of this amount, $450,000 was allocated by the jury as noneconomic damages. The jury found OCF's percentage of fault to be 28 percent. In a third phase of the trial, the jury declined to award plaintiff any punitive damages against OCF.

The parties filed posttrial cross-motions with respect to the issue of the applicability of Proposition 51 to the case. Based on the unrebutted medical testimony of Dr. Barry Horn, the trial court determined plaintiff probably had subclinical cancer cell formation at least seven years before the discovery of fluid in his lungs in 1991. The court held that plaintiff's cause of action therefore "accrued," for purposes of Proposition 51, at the time of such asymptomatic cancer cell formation, and that since Proposition 51 was prospective only under this court's holding in *Evangelatos, supra*, 44 Cal.3d 1188, it did not apply to plaintiff's case.

The Court of Appeal affirmed, observing that given the facts of this case, the question of accrual was largely a legal and not a factual one. In other words, if a "discovery" (i.e., "manifestation" or "diagnosis") accrual rule were to be applied, "that date would almost inevitably be 1991 or 1992, several years after the effective date of Proposition 51, hence triggering its

applicability to the noneconomic portion of plaintiff's damages." Conversely, given the unrebutted testimony that plaintiff probably had subclinical cancer cell formation seven years prior to the 1991 discovery of fluid in his lungs, under the accrual test applied by the trial court, plaintiff's cause of action would have accrued no later than 1984, two years prior to the effective date of Proposition 51, thereby rendering the tort reform measures inapplicable to his case.

## III. *Discussion.*

### A. *Proposition 51 and Evangelatos.*

■ OCF and various amici curiae[2] contend the trial court should have applied Proposition 51 to plaintiff's award of noneconomic damages. As noted, Proposition 51, which took effect June 4, 1986, significantly modified the common law rule of joint and several liability in comparative fault situations. Under the initiative measure's provisions multiple tortfeasors continue to be jointly and severally liable for all economic damages. However, joint tortfeasors are only liable for the percentage of *noneconomic* damages commensurate with their own percentage of fault. (Civ. Code, § 1431.2, subd. (a); *Evangelatos, supra,* 44 Cal.3d at p. 1198.)

The Fair Responsibility Act of 1986 (Civ. Code, §§ 1431-1431.5), popularly known as Proposition 51, begins with the following statement of "Findings and Declaration of Purpose": "(a) The legal doctrine of joint and several liability, also known as the 'deep pocket rule,' has resulted in a system of inequity and injustice that has threatened financial bankruptcy of

---

[2]Owens-Illinois Inc., which manufactured asbestos-containing products in the late 1940's and 1950's, is a defendant in numerous pending asbestos-related personal injury lawsuits in California and nationwide, and sold its entire product line of "Kaylo" asbestos insulation to OCF in 1958, has filed an amicus curiae brief in support of defendant OCF. General Electric Company, joined by various defendants in the Lockheed Litigation Cases, Los Angeles Coordination Proceedings No. 2967, have likewise filed an amici curiae brief in support of OCF. Asbestos Victims of America, a California nonprofit organization purporting to "represent[] more than 20,000 asbestos victims," has in turn filed an amicus curiae brief in support of plaintiff James Buttram.

In addition, by order dated October 17, 1996, this court designated the instant matter as the lead case on the Proposition 51 accrual issue and indicated that "[a]ll amicus curiae briefs filed in *Coughlin* v. *Owens-Illinois,* S037837, which address the Proposition 51 accrual issue, and all briefs filed in that case in reply thereto, shall be considered by this court in deciding the issue in the instant case." The following organizations and entities filed amicus curiae briefs in this court in *Coughlin* v. *Owens-Illinois* in support of the defendants (Owens-Illinois, Inc. and The Celotex Corporation) in that appeal: Plant Insulation Company; Owens-Corning Fiberglas Corporation; California Chamber of Commerce; California Manufacturers Association; General Motors Corporation; Swinerton & Walberg Co.; Dillingham Construction N.A., Inc.; Fibreboard Corporation; Kaiser Gypsum Company, Inc.; and The Center For Claims Resolution.

local governments, other public agencies, private individuals and businesses and has resulted in higher prices for goods and services to the public and in higher taxes to the taxpayers. [¶] (b) . . . Under joint and several liability, if ["deep pocket defendants"] are found to share even a fraction of the fault, they are often held financially liable for all the damage. The People—taxpayers and consumers alike—ultimately pay for these lawsuits in the form of higher taxes, higher prices and higher insurance premiums. [¶] (c) Local governments have been forced to curtail some essential police, fire and other protections because of soaring costs of lawsuits and insurance premiums." (Civ. Code, § 1431.1.)

In consideration of these express findings, Proposition 51 declares as its purpose "to remedy these inequities" by holding defendants "liable in closer proportion to their degree of fault. To treat them differently is unfair and inequitable." (Civ. Code, § 1431.1.) The act "further declare[s] that reforms in the liability laws in tort actions are necessary and proper to avoid catastrophic economic consequences for state and local governmental bodies as well as private individuals and businesses." (*Ibid.*) It is clear from the plain language of Proposition 51 that the remedial tort reform measures it enacted were intended to eliminate the "deep pocket rule" that had "resulted in a system of inequity and injustice."

More specifically, Proposition 51 was designed to rectify the situation, under California's comparative fault tort law, whereby a defendant who bears only a small share of fault for an injury can be left with the obligation to pay all or a large share of the plaintiff's damages if more culpable tortfeasors are insolvent. The drafters of Proposition 51 attempted to alleviate the perceived inequity arising from this situation. "While recognizing the potential inequity in a rule which would require an injured plaintiff . . . to bear the full brunt of the loss if one of a number of tortfeasors should prove insolvent, the drafters of the initiative at the same time concluded that it was unfair . . . to require a tortfeasor who might only be minimally culpable to bear all of the plaintiff's damages. As a result, the drafters crafted a compromise solution: Proposition 51 retains the traditional joint and several liability doctrine with respect to a plaintiff's *economic* damages, but adopts a rule of several liability for *noneconomic* damages, providing that each defendant is liable for only that portion of the plaintiff's noneconomic damages which is commensurate with that defendant's degree of fault for the injury." (*Evangelatos, supra,* 44 Cal.3d at p. 1198, italics in original.)[3]

As noted, in *Evangelatos* this court held the tort reform measures of Proposition 51 prospective only. (44 Cal.3d at pp. 1193-1194.) More specifically, we held that Proposition 51 does not apply to a cause of action that

---

[3]Civil Code section 1431.2, which is the heart of Proposition 51, provides: "(a) In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several

has "accrued" before the initiative measure's effective date of June 4, 1986. (44 Cal.3d at pp. 1193, 1205.) In this case we must determine when plaintiff's cause of action for damages arising from the asbestos-related latent and progressive disease pleural mesothelioma "accrued" for the limited purpose of determining whether the application of Proposition 51 to his case would constitute a retroactive application of the tort reform measures in contravention of this court's holding in *Evangelatos*.

Under the facts of *Evangelatos*, *supra*, 44 Cal.3d 1188, there was no question that the cause of action for personal injuries accrued well before the effective date of the initiative measure's provisions. In *Evangelatos*, the plaintiff was injured while attempting to make fireworks with chemicals supplied by the defendants. The alleged wrongful acts and traumatic injury all occurred in 1980, six years before the effective date of Proposition 51. Moreover, given the immediately evident nature of plaintiff's injuries there was no issue of delayed discovery of the harm proximately caused by defendants' tortious acts. (*Evangelatos*, *supra*, 44 Cal.3d at pp. 1194-1195.)

Here, by contrast, it is much more difficult to determine the date on which plaintiff's cause of action for mesothelioma-related injuries can be said to have "accrued." Mesothelioma is a latent, progressively developing disease—decades can often pass between the time a person is first exposed to asbestos and the time he first develops a cancerous mesothelioma tumor. Moreover, although early formation of undetected cellular changes ultimately leads to contraction of the disease, it may be years before the cancerous cells will result in a tumor large enough to be detected, be medically diagnosed, or cause symptomatology of the disease. It has been observed generally that "diagnosis of toxic related disease is almost always an uncertain enterprise, particularly in the early stages of the disease. Lack of understanding of biological and physiological mechanisms, absence of serious dysfunction, and the slowly progressive nature of some diseases contribute to the difficulties of diagnosis. . . . [¶] The combination of lengthy latency periods and diagnostic difficulties is a unique feature of toxic substances cases for purposes of statutes of limitations analysis [or related legal issues]: No temporally discrete event exists that encompasses the defendant's breach and the plaintiff's injury. Instead, insidious disease litigation involves an extended chronology of causation unlike traditional snapshot torts." (Green, *The Paradox of Statutes of Limitations in Toxic Substances Litigation* (1988) 76 Cal.L.Rev. 965, 975-976, fn. omitted.)

only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

Louisiana's high court has aptly characterized the problem, in the related context of litigation involving the latent disease asbestosis: "The difficulties in asbestosis cases arise because, unlike in traditional personal injury cases in which the damage results from a single, identifiable act causing traumatic injury, in asbestosis cases the damage results from a continuous process—a slow development of this hidden disease over the years. [Citation.] Compounding the problem, asbestosis cases are characterized by a lengthy latency period—typically ranging a decade or two—and, consequently, a lengthy temporal separation between the tortious conduct and the appearance of injury. [Citation.] This lengthy latency period renders efforts to pinpoint the date on which the disease was contracted virtually impossible, medically and legally. [Citations.] Further, this inability to pinpoint when injuries were sustained in asbestosis cases renders determining the date on which a plaintiff's cause of action accrued a herculean task." (*Cole* v. *Celotex Corp.* (La. 1992) 599 So.2d 1058, 1065-1066, fn. omitted.)

Analytically, one could posit a continuum of triggering events which, from a medical or legal standpoint, might be used to establish the date on which a cause of action for personal injuries arising from a latent disease has "accrued," beginning with initial exposure to the toxic substance and proceeding through the inception of undetected physical changes (i.e., "subclinical" or "cellular" changes), the first appearance of symptoms, medical diagnosis (which may come before or after the onset of symptomatology), and the occurrence of certain legally significant events (i.e., actual or constructive knowledge of the onset of disease). For purposes of resolving the issue in this case, however, it is important to note that such a cause of action may be viewed in the eyes of the law as "accruing" for different purposes on different dates, depending on the purpose for which the accrual determination is being sought.

For example, in the context of third party liability insurance coverage, some courts have invoked a relatively early accrual date, i.e., the "injury-in-fact" "trigger of coverage," which looks to a subclinical injury, proved in retrospect by medical testimony to have existed at the relevant time, as the point at which third party liability insurance coverage is triggered under a liability insurance policy. (See, e.g., *Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 676-677, fn. 16 [42 Cal.Rptr.2d 324, 913 P.2d 878]; *American Home Products Corp.* v. *Liberty Mut. Ins.* (2d Cir. 1984) 748 F.2d 760, 766.) ■ In contrast, for statute of limitations purposes, it is well settled that a cause of action for a latent injury does not accrue until the plaintiff discovers or reasonably should have discovered that he has suffered a compensable injury. (See *Velasquez* v. *Fibreboard Paper Products Corp.* (1979) 97 Cal.App.3d 881, 887-888 [159 Cal.Rptr. 113] [applying

"discovery rule" to strict liability action].) The policy reason behind the discovery rule is to ameliorate a harsh rule that would allow the limitations period for filing suit to expire before a plaintiff has or should have learned of the latent injury and its cause. ██ (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, §§ 354-355, pp. 382-383; see Green, *The Paradox of Statutes of Limitations in Toxic Substances Litigation, supra,* 76 Cal.L.Rev. at pp. 976-978.)[4]

██ Here, however, we are not dealing with a question of coverage under a policy of insurance, nor a statute of limitations issue. Instead, we are specifically concerned with when the plaintiff's cause of action for asbestos-related latent injuries should be deemed to have "accrued" for the specific and limited purpose of determining whether the provisions of Proposition 51 can prospectively be applied to his case, consistent with the rationale of our holding in *Evangelatos, supra,* 44 Cal.3d 1188. Although *Evangelatos* was not itself a latent injury case, we believe the answer to our inquiry in this case is found in our explication of the rationale behind the rule of prospectivity adopted in *Evangelatos.*

B. *The Purposes Behind Adoption of the Rule of Prospectivity in Evangelatos Should Govern Selection of an Accrual Rule in This Latent Injury Case.*

██ It is settled after *Evangelatos, supra,* 44 Cal.3d 1188, that the tort reform measures enacted by Proposition 51 are prospective only and apply only to causes of action "accruing" after its effective date of June 4, 1986. The parties' reasonable reliance on the laws governing recovery for personal injuries was of paramount concern in our determination in *Evangelatos* to declare Proposition 51 prospective only. In that case, "[p]laintiff point[ed] out that prior to the enactment of Proposition 51 many individuals—both plaintiffs and defendants—relied on the then-existing joint and several liability doctrine in deciding which parties to join in litigation and whether

[4]Generally speaking, to be actionable, harm must constitute something more than " 'nominal damages, speculative harm, or the threat of future harm—not yet realized . . . .' " (*Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 656, fn. 11 [135 Cal.Rptr. 75, 557 P.2d 507], quoting *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433] [discussing the concept of actual harm in attorney malpractice actions].) In California, harm or injury to the plaintiff is an essential element of a ripe cause of action in negligence or strict liability. (See BAJI Nos. 3.00, 9.00 (7th ed. 1992 pocket pt.); *Sinai Temple* v. *Kaplan* (1976) 54 Cal.App.3d 1103, 1113 [127 Cal.Rptr. 80].) Moreover, as a general proposition it is settled that a plaintiff's cause of action accrues for purposes of the statute of limitations upon the occurrence of the *last* element essential to the cause of action; that is when the plaintiff is first entitled to sue. (Code Civ. Proc., § 312; *Spear* v. *California State Auto. Assn.* (1992) 2 Cal.4th 1035, 1040 [9 Cal.Rptr.2d 381, 831 P.2d 821]; 3 Witkin, Cal. Procedure, *supra,* Actions, § 351, pp. 380-381.)

to accept or reject settlement offers relating to such preexisting claims, and plaintiff contend[ed] that because there [was] nothing in the terms of the proposition which indicates that it [was] to apply retroactively to defeat such reliance, the lower courts erred in giving it such an application. In response, defendants contend[ed] that retroactive application [was] warranted in light of the nature and purposes of the initiative measure." (*Evangelatos, supra*, 44 Cal.3d at p. 1205.)

We observed in *Evangelatos* that, "The drafters of the initiative measure . . . did not include any language in the initiative indicating that the measure was to apply retroactively to causes of action that had already accrued and there is nothing to suggest that the electorate considered the issue of retroactivity at all. Although defendants argue that we should nonetheless infer a legislative intent on the part of the electorate to apply the measure retroactively from the general purpose and context of the enactment [i.e., the circumstance that 'the measure was adopted in response to a liability crisis'], the overwhelming majority of prior judicial decisions—both in California and throughout the country—which have considered whether similar tort reform legislation should apply prospectively or retroactively when the statute is silent on the point have concluded that the statute applies prospectively. Reflecting the commonsense notion that it may be unfair to change 'the rules of the game' in the middle of a contest, these authorities persuasively demonstrate that the general legal presumption of prospectivity applies with full force to a measure, like the initiative at issue here, which substantially modifies a legal doctrine *on which many persons may have reasonably relied in conducting their legal affairs prior to the new enactment.*" (*Evangelatos, supra*, 44 Cal.3d at p. 1194, italics added.)

In response to the contention of the defendants in *Evangelatos* that the remedial purpose of Proposition 51 necessarily demonstrates the electorate must have intended that it apply retroactively, we explained, "[w]hat defendants' contention overlooks is that there are special considerations—quite distinct from the merits of the substantive legal change embodied in the new legislation—that are frequently triggered by the application of a new, 'improved' legal principle retroactively to circumstances in which individuals may have already taken action in reasonable reliance on the previously existing state of the law. . . . The presumption of prospectivity assures that reasonable reliance on current legal principles will not be defeated in the absence of a clear indication of a legislative intent to override such reliance." (*Evangelatos, supra*, 44 Cal.3d at pp. 1213-1214.)

Given our conclusion in *Evangelatos* that the electorate did not specifically consider the question of prospectivity or retroactivity of the tort

reform measures enacted by Proposition 51, it follows that the voters likewise did not directly consider how those new measures might specifically apply to *latent injury cases*, and the unique "accrual" problems presented by that category of cases. Although this court had no occasion in *Evangelatos* to directly consider when a cause of action for latent injuries accrues for purposes of applying Proposition 51 (in *Evangelatos* the traumatic injury, legal consultation, filing of the lawsuit, and pretrial activity all preceded the effective date of Proposition 51), our reasoning in that case as to why consideration of *the parties' reasonable reliance on former law* justified application of the general presumption of prospectivity to the newly enacted tort reform measures is equally relevant to our adoption of a limited rule of accrual in this latent injury case. As we explained in *Evangelatos*:

"[R]etroactive application of [Proposition 51] could result in placing individuals who had acted in reliance on the old law in a worse position than litigants under the new law. . . . [¶] To begin with, plaintiffs whose causes of action arose long before Proposition 51 was enacted will often have *reasonably relied on the preexisting joint and several liability doctrine in deciding which potential tortfeasors to sue and which not to sue.* Given the joint and several liability rule, plaintiffs may reasonably have determined that while there may have been other tortfeasors—in addition to the defendants named in their complaint—who might also be responsible for their injuries, there was no reason to go to the added expense and effort to attempt to join such other tortfeasors, since plaintiffs could recover all of their damages—economic and noneconomic—from the named defendants. Such plaintiffs would have understood, of course, that under the then governing rules, the named defendants could bring any such additional tortfeasors into the suit through cross-complaints if the defendants desired.

"While Proposition 51 itself . . . does not bar a plaintiff from joining additional tortfeasors—indeed, its effect in the future well may be to encourage plaintiffs to join every conceivable responsible party—the retroactive application of the measure to preexisting causes of action would frequently have the effect of depriving plaintiffs of any opportunity to recover the proportion of noneconomic damages attributable to absent tortfeasors, because *in many cases the statute of limitations on the plaintiff's preexisting cause of action against such an absent tortfeasor will have run before the enactment of Proposition 51.* Thus, while there is nothing in the language or legislative history of Proposition 51 to suggest that the electorate intended to cut off a plaintiff's opportunity to obtain full recovery for noneconomic damages, the retroactive application of the measure would frequently have just such an effect.

"In similar fashion, retroactive application of the proposition to actions which were pending prior to adoption of the measure would frequently

*defeat the reasonable expectations of parties who entered into settlement agreements in reliance on the preexisting joint and several liability rule.* Acting on the assumption that any nonsettling defendants would remain fully liable for both economic and noneconomic damages, plaintiffs in pre-Proposition 51 actions may frequently have settled with some defendants for a lesser sum than they would have accepted if they were aware that the remaining defendants would only be severally liable for noneconomic damages. By contrast, plaintiffs who settle causes of action accruing after Proposition 51 would be fully aware of the applicable principles.

"Furthermore, retroactive application of Proposition 51 could also have unanticipated, adverse consequences for settling defendants as well. . . . [U]nder pre-Proposition 51 law, a defendant could choose to enter into a settlement agreement with the plaintiff which settled the plaintiff's entire claim against all defendants, and could thereafter bring an equitable comparative indemnity action against other tortfeasors to compel them to bear their fair share of the amount which the settling defendant had paid in settlement of the plaintiff's claim. [Citations.] Under preexisting law, if a settling defendant pursued such a course of action and if one or more of the culpable tortfeasors proved to be insolvent, the shortfall caused by such insolvency would be shared on an equitable basis by all of the solvent tortfeasors. [Citation.] If Proposition 51 were applied retroactively to causes of action that accrued prior to its enactment, however, a nonsettling tortfeasor who was faced with an indemnity claim brought by a settling tortfeasor would be able to limit his liability for noneconomic damages to a percentage equal to his own personal degree of fault, and the settling tortfeasor—who had entered into the settlement in reliance on the preexisting state of the law— would be left to absorb by himself any proportion of the noneconomic damages that was attributable to an insolvent tortfeasor or tortfeasors.

"Thus, retroactive application of the measure *to past litigation* could have unexpected and potentially unfair consequences for all parties who acted in reliance on the then-existing state of the law. Prospective application of the measure . . . would assure that all parties to litigation were aware of the basic 'ground rules' *when they decided whom to join in the action and on what terms the case should be settled.*" (*Evangelatos, supra,* 44 Cal.3d at pp. 1215-1217, fn. omitted, italics added.)

An examination of these considerations in the context of a suit for personal injuries arising from a latent disease such as asbestos-related pleural mesothelioma supports the conclusion that applying the law in effect when plaintiff is first diagnosed with the disease, or when symptoms of the disease first become manifest, will *not* work a retroactive application of

Proposition 51 in contravention of the principles underlying our holding in *Evangelatos, supra,* 44 Cal.3d 1188.

If we determine that a cause of action accrues for purposes of Proposition 51 by looking to the date of diagnosis of the plaintiff's latent disease, or the date the plaintiff first discovered his manifested injuries, then the question of whether the parties have placed any reasonable reliance on pre-Proposition 51 law is brought into clear focus. Until the plaintiff's injury is first diagnosed or discovered by the plaintiff, he has no awareness of his disease or injuries, or of the possibility of a future need to file suit, much less any expectation of recovery. If diagnosis, or the plaintiff's discovery of his latent injuries, does not occur until after June 4, 1986, the effective date of Proposition 51, then neither the plaintiff nor the defendant has had any occasion to calculate potential liability under the former rule of unrestricted joint and several liability. Without awareness or discovery of the manifestation of actual harm or injury, no litigation has been contemplated, no lawsuit filed, no potential tortfeasors targeted as defendants, no reliance placed on the joint and several liability rule for noneconomic damages, and no settlements contemplated or agreed to. Nor would the statute of limitations have run on any cause of action against any potential defendant, given the applicability of the "discovery rule" noted above. (*Velasquez* v. *Fibreboard Paper Products Corp., supra,* 97 Cal.App.3d at pp. 887-888.) And from the defendants' perspective, no potential defendant would have made any settlement decisions or contemplated equitable indemnity actions against nonsettling co-tortfeasors.

Moreover, until there has been actual harm or injury *and an awareness of same,* there can be no noneconomic damages to be pled—such as pain, mental suffering, inconvenience, emotional distress, loss of society and companionship, loss of consortium, or injury to reputation and humiliation— the category of damages to which Proposition 51 is addressed. (Civ. Code, § 1431.2, subd. (b)(2).)

In short, none of the considerations that militated against declaring Proposition 51 retroactive in *Evangelatos, supra,* 44 Cal.3d 1188, would be undermined by a rule that looks to diagnosis or discovery of actual injury as the date on which a cause of action should be deemed to accrue for the limited purpose of determining whether Proposition 51's tort reform measures can be fairly and prospectively applied in a latent injury case.

In contrast, by using hindsight, as called for under the Court of Appeal's qualified "appreciable harm" test, which establishes accrual for Proposition 51 purposes by looking to subclinical changes at the cellular level (i.e.,

undetected development of the first cancer cells)—proved only in retrospect by medical testimony to have *in probability* existed at the relevant time—one could never say that the parties *in actuality* either formed or did not form any "settled expectations" or "reasonable reliance" on pre-Proposition 51 law, because the events or occurrences to which the accrual rule is tied by definition will always have gone *undetected* by the plaintiff.[5]

Plaintiff also urges that adoption of an accrual rule in this case that applies the law in effect on the date of diagnosis or discovery of actual harm or injury will stand in conflict with the general principle that a defendant's liability must be determined by the law in effect when the defendant's misconduct inflicted the injury. (See also dis. opn. of Mosk, J., *post*, at pp. 543, 545.) The short answer is that we are not in this case fashioning an accrual rule that defines liability in the latent injury context or otherwise determines the point at which a defendant will become legally liable for the plaintiff's injuries. We are instead simply devising an appropriate rule of accrual to be applied *for the specific and limited purpose of determining whether Proposition 51 can be prospectively applied in a latent injury case*, a rule that will effectuate rather than thwart the will of the voters who overwhelmingly passed Proposition 51's tort reform measures over a decade ago, while remaining fair to the parties, consistent with the rationale of our holding in *Evangelatos*, *supra*, 44 Cal.3d 1188.[6]

---

[5]The dissent suggests that "[t]he analytic difficulty in these cases is that the point at which compensable harm has been suffered will always have to be evaluated in retrospect." (Dis. opn. of Mosk, J., *post*, at p. 544.) Of course this begs the question; there is no "analytic difficulty" at all with the accrual rule we adopt today, for it is a logical extension and application of the principles announced in *Evangelatos*, *supra*, 44 Cal.3d 1188, to a latent injury case, and is *not* dependent on medical testimony that seeks to retrospectively determine the point at which asymptomatic undetected cellular changes in probability first altered the plaintiff's physiology years or decades earlier. We agree that any test that ignores the principles upon which our holding in *Evangelatos* was grounded, and instead calls upon such medical testimony to establish accrual for Proposition 51 purposes, will always present "analytic difficulty." Under the Court of Appeal's qualified "appreciable harm" test, or the test devised by the dissent here ("An individual sustains an 'injury,' for purposes of Proposition 51, when he has undergone a physiological change that will, to a reasonable degree of medical certainty, result in a condition giving rise to the cause of action" [dis. opn. of Mosk, J., *post*, at p. 544]), such a hindsight medical determination of when an undiscovered cause of action in probability first "accrued" would become a matter of factual speculation and conjecture in every case.

[6]A more detailed answer would entail consideration of the United States Supreme Court's recent decision in *Landgraf* v. *USI Film Products* (1994) 511 U.S. 244 [114 S.Ct. 1483, 128 L.Ed.2d 229] (*Landgraf*).

*Landgraf* held that certain provisions of the Civil Rights Act of 1991 (42 U.S.C. § 1981a(a)), which created the right to recover compensatory and punitive damages for specified violations of title VII of the Civil Rights Act of 1964, could not be applied to a title VII case pending on appeal when the new law took effect. The high court noted that nothing

As we have explained, in the latent disease context, until the plaintiff is diagnosed with or otherwise learns he has the disease, he has not placed *any* reliance on rules of law governing potential tort causes of action of which he is as yet unaware. It would make little sense to look to the occurrence of the "wrongful act" (in essence, plaintiff's *exposure* to defendants' asbestos products) as the sole event establishing accrual of a cause of action for the purpose of determining whether Proposition 51 is being retroactively applied. Diagnosis or discovery of actual injury or symptoms is the earliest point at which it might reasonably be said, in the latent disease context, that the plaintiff has been placed on actual notice of his injuries such that he might contemplate suit and place reasonable reliance on the rules and laws governing recovery of damages for his compensable injuries.

---

in the text of the act required its application to pending cases, and then observed: "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.' [Citation.]" (511 U.S. at p. 265 [114 S.Ct. at p. 1497], fns. omitted.)

However, the *Landgraf* court, like this court in *Evangelatos*, was not confronted with a situation in which a change in the law occurred during the long latency period of a disease that did not cause symptoms for years, but which ultimately gave rise to actionable injuries proximately caused by tortious conduct occurring years earlier. Nevertheless, we believe *Landgraf*'s analysis of statutory retroactivity is relevant to latent injury cases. It is true, of course, that plaintiff came into contact with defendants' asbestos products nearly two decades before he was diagnosed with, and learned he had contracted, the asbestos-related cancer pleural mesothelioma. But as *Landgraf* explains: "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, [citation], or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, . . . familiar considerations of *fair notice, reasonable reliance,* and *settled expectations* offer sound guidance." (*Landgraf, supra,* 511 U.S. at pp. 269-270 [114 S.Ct. at p. 1499], fn. omitted, italics added.)

In determining whether a statute is being applied retroactively, *Landgraf, supra,* 511 U.S. 244, therefore teaches that the relevant inquiry is not necessarily when the defendant's wrongful conduct occurred but whether the new law attaches new legal consequences to "events completed" before its enactment, and that such a determination must include consideration of fair notice, reasonable reliance, and settled expectations. Stated otherwise, did the parties reasonably rely on the former rule or law and form expectations based on existing legal consequences such that imposition of the new rule or law would be manifestly unfair? These were the precise considerations underlying the rationale of our decision in *Evangelatos, supra,* 44 Cal.3d 1188, and they remain the relevant considerations for devising an appropriate Proposition 51 rule of accrual in asbestos-related latent injury cases.

Plaintiff also urges us to consider the reasoning of the Maryland high court's decision in *Owens-Illinois* v. *Armstrong* (1992) 326 Md. 107 [604 A.2d 47] (*Owens-Illinois*). At issue in *Owens-Illinois* was Maryland's statutory cap on noneconomic damages which, by its express terms, was made applicable " '[i]n any action for damages for personal injury in which the cause of action *arises* on or after July 1, 1986. . . .' " (604 A.2d at p. 53, italics in original.) In rejecting the defendants' argument that the discovery rule, used to establish accrual in the statute of limitations context in asbestos-related latent injury cases in that state (see *Harig* v. *Johns-Manville Products* (1978) 284 Md. 70, 82-84 [394 A.2d 299, 306, 1 A.L.R.4th 105]), should likewise be utilized to determine accrual for purposes of applying the new tort reform measure's statutory cap, the Maryland high court concluded the statutory cap did not apply to a preexisting asbestosis condition although it was not diagnosed until *after* the statute's effective date. (*Owens-Illinois*, *supra*, 604 A.2d at pp. 53-55.)

The *Owens-Illinois* court's holding appears to have turned to a large extent on the express wording of the statute there under scrutiny. Focusing on the term "arises," the court applied the rule of statutory construction that would give that term its ordinary meaning, found that a cause of action "*arises when it first comes into existence,*" and therefore determined that the subclinical harm to the cells and tissues of the lungs caused by the disease asbestosis during its lengthy latency period was sufficient to establish that a cause of action had "arisen" within the meaning of the statute's language. (*Owens-Illinois*, *supra*, 604 A.2d at pp. 53-54; see also *Cole* v. *Celotex Corp.*, *supra*, 599 So.2d at pp. 1064-1065 [interpreting a Louisiana tort reform statute by its terms *expressly* made applicable to "claims arising" after its effective date].) Here, in contrast, Civil Code section 1431.2, enacted by Proposition 51, contains no similar controlling language.

In any event, the Maryland high court's opinion in *Owens-Illinois*, *supra*, 604 A.2d 47, gives no consideration whatsoever to the analogous policy considerations and purposes to be served in adopting an accrual rule that determines the applicability of a tort reform statute such as Proposition 51. We cannot agree that subclinical alteration of the cells during the decades-long latency period of asbestos-related disease, determined only in retrospect through medical testimony, without manifestation of any symptoms or awareness of illness on the plaintiff's part, should be the event establishing accrual of a cause of action for the limited purpose of determining whether the provisions of a tort reform statute like Proposition 51 can fairly be applied prospectively in a latent injury case. Lest we lose sight of the precise issue here, the purpose of the tort reform measures adopted by the electorate through the passage of Proposition 51 was *not* to allow a defendant found

comparatively at fault for a plaintiff's injuries to escape all liability for the plaintiff's noneconomic damages. If Proposition 51 applies to plaintiff's case, defendant OCF will still remain severally liable for that proportion of plaintiff's noneconomic damages equal to its own percentage of fault, as determined by the jury.[7]

■ Lastly, plaintiff urges, for the first time in his brief on the merits in this court, that because OCF was found to have acted with fraud or malice in its conduct toward plaintiff, such findings rendered OCF an "intentional tortfeasor" such that OCF cannot now "assert the benefit" of Proposition 51's tort reforms. The argument is meritless. The findings referred to by plaintiff were sought in connection with plaintiff's prayer for punitive damages, the jury ultimately determining to award no punitive damages to plaintiff in this case. The liability phase of trial proceeded on a products liability theory. There is no authority supportive of plaintiff's suggestion that the applicability of the tort reform measures embodied in Civil Code section 1431.2 in a products liability or negligence case should turn on the outcome of findings made specifically in connection with the punitive damages phase of trial. Nor does the wording of the statute lend itself to such an interpretation, plaintiff's cause of action herein having been based upon "principles of comparative fault." (Civ. Code, § 1431.2, subd. (a).)

### IV. *Conclusion.*

The qualified "appreciable harm" test adopted by the Court of Appeal in this case for determining whether Proposition 51 can be applied prospectively in a latent injury case bears little or no relation to the considerations of fairness and policy that led this court in *Evangelatos, supra,* 44 Cal.3d 1188, to declare the initiative's tort reform measures prospective only. As a practical matter, the Court of Appeal's holding would make the now disfavored doctrine of joint and several liability for noneconomic damages

---

[7]The dissent urges that "[t]he majority's holding will deprive numerous plaintiffs suffering from so-called 'latent' diseases caused by exposure to asbestos and other hazardous substances of full compensation for injuries inflicted by tortfeasors long before Proposition 51 went into effect." (Dis. opn. of Mosk, J., *post,* at p. 541.) The concern is unfounded. Plaintiff's economic damages of course remain unaffected by Proposition 51. And under Proposition 51's tort reform measures, a plaintiff is not precluded from recovering 100 percent of his noneconomic damages, although such recovery must be sought from all responsible defendants with regard to their respective "percentages of fault." Here, plaintiff originally brought suit against several named defendants, all of whom settled with the exception of OCF, which elected to proceed to trial. Presumably plaintiff's settlements with the other defendants included sums calculated to compensate him for their proportionate share of his noneconomic damages prayed for in the complaint. Even if OCF, which was found by the jury to be 28 percent "at fault" for its share of plaintiff's noneconomic damages, is required under Proposition 51 to pay only its proportionate share of the $450,000 award of noneconomic damages, we are without a sound basis to conclude plaintiff is thereby being "deprived of full compensation" for his noneconomic damages.

applicable to virtually all asbestos-related personal injury actions. Under the Court of Appeal's test, the lawsuits of any presently identified or future asbestos plaintiff who, as of Proposition 51's effective date of June 4, 1986, had no actual physical impairment or symptoms of any asbestos-related disease and who had yet to suffer any noneconomic damages or harbor any awareness that he would in the future suffer from such a disease and ultimately bring suit against asbestos defendants—but whose medical experts later convince a jury in retrospect that in probability formation of asymptomatic and undetected cellular changes had commenced decades earlier—would be governed by tort laws overwhelmingly abrogated by the electorate over a decade ago. Indeed, given the decades-long latency periods of asbestos-related disease, it is not unrealistic to conclude that under the accrual test adopted by the Court of Appeal, the now disfavored joint and several liability rule would still have to be applied in asbestos-related latent injury litigation well into the 21st century.

In contrast, a rule that looks to the earliest of diagnosis of the harm or disease or plaintiff's awareness or discovery of manifested symptoms, *for the limited purpose of determining whether the tort reform measures of Proposition 51 can fairly be applied prospectively to the plaintiff's lawsuit,* will further the purposes of the tort reform measures while ensuring that no party suffers detriment as a result of any actual and reasonable reliance on pre-Proposition 51 law.

We conclude the Court of Appeal applied an inappropriate test for determining when plaintiff's cause of action for asbestos-related latent injuries accrued for the limited purpose of determining whether Proposition 51 can fairly be applied prospectively to his case consistent with the holding of *Evangelatos.* We hold instead that a cause of action for damages arising from a latent and progressive disease such as asbestos-related pleural mesothelioma will be deemed to have "accrued"—thereby precluding retroactive application of Proposition 51 under this court's holding in *Evangelatos*—if the plaintiff was diagnosed with the disease for which damages are being sought, or otherwise discovered his asbestos-related illness or injuries prior to June 4, 1986, the effective date of Proposition 51.

As previously noted, the Court of Appeal in this case determined that "[i]f a 'date of discovery' standard is applied, that date would almost inevitably be 1991 or 1992, several years after the effective date of Proposition 51, hence triggering its applicability to the noneconomic portion of plaintiff's damages." The Court of Appeal indicated that because of the possibility of a ruling that Proposition 51 would be found applicable to the case, the jury was asked to, and did, supply a percentage figure for OCF's "fault." We

therefore reverse the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I dissent.

The majority's holding will deprive numerous plaintiffs suffering from so-called "latent" diseases caused by exposure to asbestos and other hazardous substances of full compensation for injuries inflicted by tortfeasors long before Proposition 51 went into effect. In my view, the majority's reasoning and result are incorrect.

I.

In *Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188 [246 Cal.Rptr. 629, 753 P.2d 585] (hereafter *Evangelatos*), we held that Proposition 51, which limits a tortfeasor's liability for noneconomic damages to its percentage of fault, must apply prospectively only. A tortfeasor who caused an injury before Proposition 51's effective date would continue to be subject to the traditional common law doctrine of joint and several liability. In so holding, we reaffirmed our seminal retroactivity decision, authored by Chief Justice Gibson, in *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388 [182 P.2d 159].

We explained: " ' "[A] retrospective law is one which affects rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the statute." ' [Citation.] 'Since the industrial injury is the basis for any compensation award, the law in force at the time of the injury is to be taken as the measure of the injured person's right of recovery.' " (*Evangelatos, supra*, 44 Cal.3d at p. 1206, quoting *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com., supra*, 30 Cal.2d at pp. 391, 392.)

We emphasized: "Decisions of both the United States Supreme Court and the courts of our sister states confirm that the application of a tort reform statute to a cause of action which arose prior to the effective date of the statute but which is tried after the statute's effective date would constitute a retroactive application of the statute." (*Evangelatos, supra*, 44 Cal.3d at p. 1206, citing *Winfree* v. *Nor. Pac. Ry. Co.* (1913) 227 U.S. 296 [33 S.Ct. 273, 57 L.Ed. 518], and *Joseph* v. *Lowery* (1972) 261 Or. 545 [495 P.2d 273]; see also *Landgraf* v. *USI Film Products* (1994) 511 U.S. 244, 269-270 [114

S.Ct. 1483, 1499-1500, 128 L.Ed.2d 229] [in determining whether a statute operates "retrospectively" "the court must ask whether the new provision attaches new legal consequences to events completed before its enactment"]; *Miller* v. *Florida* (1987) 482 U.S. 423, 430 [107 S.Ct. 2446, 2451, 96 L.Ed.2d 351] ["A law is retrospective if it 'changes the legal consequences of acts completed before its effective date.' "]; *Un. Pac. R.R. Co.* v. *Laramie Stock Yards* (1913) 231 U.S. 190, 199 [34 S.Ct. 101, 102, 58 L.Ed. 179] [a retroactive statute gives "a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed"].)

We applied the general principle that legislation is presumed to operate only prospectively: " ' "[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past. . . . The rule has been expressed in varying degrees of strength but always of one import, that *a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be the 'unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'* " [Citation.]' " (*Evangelatos*, *supra*, 44 Cal.3d at p. 1207, italics added in *Evangelatos*.)

The majority now substantially overrule *Evangelatos*, by imposing, in effect, a scienter requirement for plaintiffs injured before Proposition 51 went into effect. The application *vel non* of the measure will no longer depend on "the law in force at the time of the injury." (*Evangelatos*, *supra*, 44 Cal.3d at p. 1206.) Instead, it will turn on whether a plaintiff "was diagnosed with the disease for which damages are being sought, or otherwise discovered his illness or injuries" prior to the measure's effective date. (Maj. opn., *ante*, at p. 525.)

Thus, under the majority's new standard, the " ' "rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the statute" ' " (*Evangelatos*, *supra*, 44 Cal.3d at p. 1206.) are no longer determinative of whether Proposition 51 applies. Even if a plaintiff establishes that he or she sustained a serious injury before the measure's effective date, any damages from the tortfeasors who caused the injury may be subject to the measure's damage limitations.

In my view, the majority err. The retrospective application of a provision should not depend solely on whether a plaintiff knew of his injury, and therefore had actual expectations based on prior law. As the United States Supreme Court instructed in *Landgraf*, "[a] statute does not operate 'retrospectively' merely because it . . . upsets expectations based on prior law." (*Landgraf* v. *USI Film Products*, *supra*, 511 U.S. at p. 269 [114 S.Ct. at p.

1499].) "Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." (*Id.* at pp. 269-270 [114 S.Ct. at p. 1499].)[1]

Consistent with *Evangelatos, supra,* 44 Cal.3d 1188, application of Proposition 51 should depend on when a wrongful act first gave rise to a cause of action for injury—i.e., when " 'the last element essential to the cause of action' occur[red]." (*Spear* v. *California State Auto. Assn.* (1992) 2 Cal.4th 1035, 1040 [9 Cal.Rptr.2d 381, 831 P.2d 821].) The dispositive question, therefore, should be whether a plaintiff had *existing* rights based on an injury prior to the effective date of the measure—not whether he or she knew it.

As stated in an analogous case, also involving the application of a statutory change in the laws governing personal injury actions: " 'Logic dictates that a plaintiff cannot bring a cause of action until he knows or reasonably should know of his injury, and also knows or reasonably should know that the injury was caused by the wrongful acts of another. *However, that does not mean that the plaintiff does not have an existing cause of action of which he is unaware.*' " (*Fetzer* v. *Wood* (1991) 211 Ill.App.3d 70 [155 Ill.Dec. 626, 569 N.E.2d 1237, 1243].)

I agree with the Court of Appeal that we should properly measure when a plaintiff had an *existing* cause of action from the time exposure to asbestos first resulted in a "compensable" injury from pleural mesothelioma. As we have previously observed, to be "compensable," injury must have resulted in something more than "nominal damages, speculative harm, or the threat of future harm—not yet realized." (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433].)

The critical question, therefore, in a case involving a latent injury from exposure to asbestos is: When was the injury first "compensable"? To answer that question, I would slightly paraphrase Justice Corrigan's views on this point, in one of the several cases presently under review, as follows.

When exposure to a toxic substance causes cancer in an individual, that person is injured or harmed by the acquisition of the disease, whether or not he is aware of its presence. A contrary conclusion runs counter to the accepted usage of the term "injury." The opinion in *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com., supra,* 30 Cal.2d at pages 391-392, suggested as much by expressly rejecting a contention that a new compensation rule could be

---

[1]Logically, the events giving rise to legal consequences are "completed" at the time a plaintiff sustains an injury in fact. Thus, a cause of action arises at the time when a plaintiff sustains such an injury—even if it is not yet manifested or diagnosed.

applied prospectively, as long as it was in effect not when the industrial accident occurred, but later, when the resulting disability became "manifest."

I would distill the following rule. An individual sustains an "injury," for purposes of Proposition 51, when he has undergone a physiological change that will, to a reasonable degree of medical certainty, result in a condition giving rise to the cause of action. At that point, the tortfeasor's actions have harmed the plaintiff by causing a detrimental physical condition. Whether the plaintiff is aware of it or not, he is no less injured. Under this test, a cause of action does not 'accrue' at the point of mere exposure to or inhalation of asbestos fibers, because many who are exposed will never suffer a compensable injury. Neither would a nondetrimental physiological reaction to asbestos exposure constitute accrual. On the other hand, under this definition a cause of action may, under specific circumstances, accrue for purposes of Proposition 51 application before the plaintiff is diagnosed or diagnosable.

The analytic difficulty in these cases is that the point at which compensable harm has been suffered will always have to be evaluated in retrospect. According to expert testimony given in this case, an individual will not be diagnosable with mesothelioma for some 10 to 15 years after his cells have embarked upon an irreversible progression towards the disease, which is invariably fatal. At the point of that initial cellular change, the individual has experienced no symptoms and, because he is unaware of his condition, has suffered no associated emotional distress or compensable fear of cancer. He has, however, suffered a serious functional impairment of his cells. Moreover, from that point onward, absent some intervening illness or accident, that impairment will shorten his lifespan. We think such an impairment is compensable.

It could be argued that damages for such harm are speculative because an individual could die of unrelated causes in the decade or more between the initial cellular changes and the manifestation of mesothelioma. In the unique context in which these cases arise, however, it will be beyond argument that the plaintiff has, in fact, survived long enough to manifest the disease. In choosing between a policy that would ignore the reality of an injury because it was not immediately apparent and one that would recognize harm proven to exist by expert medical testimony based on all relevant information, we believe conventional tort analysis augurs in favor of the latter.

I also reject the argument of Owens-Corning Fiberglas Corporation here that application of Proposition 51 should depend on when a plaintiff "discovered" an injury—not on when it occurred—by analogy to the statutory

provisions and judicially developed rules *tolling* the statute of limitations for certain actions until "discovery." (See 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 463, pp. 583-584.) The analogy is ill-conceived. Such tolling provisions are exceptions to the general rule that the statute of limitations begins to run when a cause of action arises—i.e., when facts exist to support each of its elements—"despite the plaintiff's ignorance of his cause of action or the identity of the wrongdoer." (*Id.*, § 460, at pp. 581-582.) Their purpose—to avoid the unfairness of allowing the time for commencing an action to expire before a plaintiff learns of an *existing* cause of action—is irrelevant to the retroactivity question we resolved in *Evangelatos*. As the Court of Appeal below observed, applying a "discovery" rule in this context "is trying to insert a square peg into a round hole." Indeed, Owens-Corning's analogy is particularly inapt to asbestos cases, in which the statute of limitations is tied not to "discovery" but to "disability" and, thus, may not commence until long after a plaintiff learned of his or her injury and its cause.[2]

The majority conclude that application of Proposition 51 should depend on when a plaintiff "discovered" the injury—not on when it occurred—because "[t]he parties' *reasonable reliance* on the laws governing recovery for personal injuries was of paramount concern in our determination in *Evangelatos* to declare Proposition 51 prospective only." (Maj. opn., *ante*, at p. 531, italics added.) They reason that there could be no "reasonable reliance" on pre-Proposition 51 joint and several liability rules unless a plaintiff knew about the injury before the measure went into effect.

They are wrong. *Evangelatos* referred to the parties' "reasonable reliance" as one policy rationale for the presumption against retroactivity of the measure, but it was not of "paramount concern." The core basis for our holding was the principle articulated in *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.*, *supra*, 30 Cal.2d at page 392, that " 'the law in force at the time of the injury is to be taken as the measure of the injured person's right of recovery.' " (*Evangelatos*, *supra*, 44 Cal.3d at p. 1206.) As discussed, that overriding principle requires that parties are bound by the rules in effect at the time of the injury, i.e., by the legal rights and obligations that *existed* when the action arose. It would be especially inappropriate to impose a

---

[2]The time for commencing an action for injury based on exposure to asbestos is the later of the following: "(1) Within one year after the date the plaintiff first suffered disability. [¶] (2) Within one year after the date the plaintiff either knew, or through the exercise of reasonable diligence should have known, that such disability was caused or contributed to by such exposure." (Code Civ. Proc., § 340.2, subd. (a).) "Disability" is defined as "the loss of time from work as a result of such exposure which precludes the performance of the employee's regular occupation." (*Id.*, subd. (b).) The limitations period is, thus, not linked to any element of the plaintiff's cause of action.

"discovery" requirement in cases involving asbestos-related injury when one of the chief reasons for the lack of "discovery" by plaintiffs like James Buttram was that tortfeasors willfully suppressed information concerning the facts of, and dangers from, exposure to asbestos.[3]

## II.

In the present case, the trial court found, on the basis of evidence that included the unrebutted expert testimony by a physician specializing in pulmonary diseases that Buttram probably had cancer cells "on the order of seven years before" he was diagnosed with pleural mesothelioma in 1991. Like the Court of Appeal, I agree that this expert testimony constituted reasonably reliable evidence that Buttram sustained a compensable injury— and, thus, had an existing cause of action—well before the effective date of Proposition 51.

For these reasons, I would affirm the judgment of the Court of Appeal.

Respondent's petition for a rehearing was denied October 15, 1997. Mosk, J., was of the opinion that the petition should be granted.

---

[3]In this matter, for example, the jury found that "[u]se of an asbestos-containing product manufactured, supplied or distributed by Owens-Corning Fiberglas involved a substantial danger known or knowable to Owens-Corning Fiberglas that would not be readily recognized by the ordinary consumer of the product" and that it "failed to give an adequate warning of the danger." The jury also found "[b]y clear and convincing evidence, Owens-Corning Fiberglas acted with malice or fraud."