875 A.2d 157

OWENS–ILLINOIS, INC.

v.

**Barbara HUNTER, Personal Representative of the Estate of Harry Hunter et al.**

No. 2215, Sept. Term, 2003.

Court of Special Appeals of Maryland.

June 1, 2005.

Robert Riley (Gerry H. Tostanoski, Scott Patrick Burns, Tydings & Rosenberg, on the brief), Baltimore, for appellant.

Edward Lily (Gary J. Ignatowski, Law Offices of Peter G. Angelos, on the brief), Baltimore, for appellee.

Paenl: DAVIS, SALMON, JOHN J. BISHOP (Retired, specially assigned), JJ.

DAVIS, J.

In the Circuit Court for Baltimore City, Harry Hunter and his wife Barbara Hunter sued Owens–Illinois, Inc., alleging that the company was responsible for Mr. Hunter's development of mesothelioma after he was exposed to asbestos almost fifty years earlier. Mr. Hunter died two months after his complaint was filed.[1] After the jury awarded the plaintiffs a multi-million dollar verdict, the trial court granted Owens–Illinois's motions for remittitur and to apply Maryland's statu-

---

1. Hence, we refer only to Ms. Hunter in this appeal, as she is both a party in her own right, and as the personal representative of Mr. Hunter's estate.

tory cap on noneconomic damages to the wrongful death damages award.

Owens–Illinois noted this appeal and presents three questions for our review, which we have rephrased:

I.   Did the circuit court err in concluding that the Hunters produced sufficient evidence to prove Mr. Hunter's exposure to Owens–Illinois's asbestos product?

II.   Did the circuit court err in concluding that, because the Hunters' loss of consortium claim arose before the enactment of Maryland's noneconomic damages cap, the cap did not apply to their loss of consortium claim?

III.   Did the circuit court err in concluding that the Hunters' loss of consortium claim was not barred as a matter of law because Mr. Hunter had been exposed to asbestos before the Hunters married?

Ms. Hunter noted a cross-appeal, and presents the following two questions, which we also rephrase:

IV.   Did the circuit court err in granting Owens–Illinois's motion for remittitur of the loss of consortium damages?

V.   Did the circuit court err in applying the noneconomic damages cap to the wrongful death count?

We conclude that the circuit court did not err in any of these respects.   Therefore, we shall affirm the judgment.

## FACTUAL BACKGROUND

This case began almost fifty years ago at the United States Coast Guard's shipyard (the Yard) located at Curtis Bay, in south Baltimore, Maryland.   From July 23 to September 10, 1956, between his junior and senior years of college, Mr. Hunter worked as an electrician's helper at the Yard for a total of thirty-three days.   Before his death, Mr. Hunter testified by videotape that military ships were refurbished at the Yard when he worked there.   The plaintiffs alleged that, while working at the Yard, Mr. Hunter was exposed to asbestos dust from Kaylo, a pipe-covering product manufactured by Owens–Illinois.   Shortly after his work at the Yard,

the Hunters married in 1960. His mesothelioma was not diagnosed until 2001, the year he died.

At trial, only one witness testified that Mr. Hunter was exposed to asbestos at the Yard. William Edwards worked at the Yard as one of the electricians to whom helpers were assigned. Based on a photograph provided by the Hunters' counsel, Edwards testified that he recognized Mr. Hunter by face, but not by name. Edwards also testified that, although Mr. Hunter never worked as his helper, he remembered seeing Mr. Hunter working at the Yard in the 1950s.

Edwards was 79 years old when he testified. He had trouble remembering the exact name of Owens–Illinois's product, but he testified that he saw the name on boxes of the product. He called the pipe-covering "Kayo," but its proper name was *Kaylo*. Regarding Mr. Hunter's exposure to asbestos dust from Kaylo, Edwards testified:

[Plaintiffs' counsel]: [W]hen this pipe covering was cut, what, if anything, did you see in the air?

[Edwards]: Oh, a lot of—a lot of stuff flying around.

[Plaintiffs' counsel]: And how long a period of time was the gentleman in the—do you recall the gentleman in the picture being at the Coast Guard Yard in the mid '50s?

[Edwards]: Well, I don't think he was there long, something like three or four months at the most.

[Plaintiffs' counsel]: Okay. And how often would you see him in the dust from the Kayo you have described?

[Defense counsel]: Objection.

THE COURT: Overruled.

[Edwards]: I would say it was quite often.

[Plaintiffs' counsel]: What type of ventilation was there in the ship, sir?

[Edwards]: Well, we had the ventilation off on the ship.

[Plaintiffs' counsel]: The ventilation was off?

[Edwards]: Yes.

[Plaintiffs' counsel]: Okay.

[Edwards]: Sometimes it would be on, too. And whenever it was on, it [blew] it all over.

[Plaintiffs' counsel]: What would blow all over?

[Edwards]: [The] asbestos.

[Plaintiffs' counsel]: Okay, and from your observation, where would the asbestos dust go from the Kayo product you described?

[Edwards]: Right on the deck, lie right on the deck, right on the people.

[Plaintiffs' counsel]: And how often did you see the ... gentleman in the picture around the dust from the Kayo?

[Defense counsel]: Objection. He already answered.

[Edwards]: Whenever—

THE COURT: Just a minute. Sustained.

[Plaintiffs' counsel]: I apologize if I already asked that.

Additionally, Ms. Hunter, who was dating Mr. Hunter at the time, testified that she remembered Mr. Hunter leaving work at the Yard with his clothes covered in "a whitish gray dust." She added that the dust also accumulated in Mr. Hunter's car.

The jury found Owens–Illinois liable for Mr. Hunter's asbestos exposure. In Mr. Hunter's survival action, his estate was awarded $10,000 in noneconomic damages for his personal injury, as well as compensatory damages of $5,000 for household services, and medical and funeral expenses of $57,503.43. The Hunters were awarded $2 million in noneconomic damages for their loss of consortium claim. Ms. Hunter was awarded $4.3 million in noneconomic damages, and a total of $81,529 in compensatory damages, for Mr. Hunter's wrongful death.

In addition to Owens–Illinois's motion for judgment notwithstanding the verdict, which was denied, the company sought remittitur of the $2 million loss of consortium damages. The trial judge found a gross disparity between the damages awarded for Mr. Hunter's personal injury in the survival action and the damages awarded to the couple for loss of consortium. On that basis, the judge granted the motion for

remittitur, requiring the plaintiffs to agree to remit $1 million of the loss of consortium damages, or to face a new trial. The plaintiffs agreed to the remittitur. Thereafter, Owens–Illinois noted this appeal, and Ms. Hunter noted her cross-appeal.

## LEGAL ANALYSIS

We first review the circuit court's denial of Owens–Illinois's motion for judgment notwithstanding the verdict, filed under Maryland Rule 2–532. In reviewing the court's decision, "we must view the evidence and the reasonable inferences therefrom in the light most favorable to" the Hunters, and "[i]f there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then we must affirm the jury's verdict on that issue." *Owens–Corning v. Walatka*, 125 Md.App. 313, 342, 725 A.2d 579 (1999), *overruled on other grounds by John Crane, Inc. v. Scribner*, 369 Md. 369, 383–90, 800 A.2d 727 (2002).

### I

Owens–Illinois first argues that the Hunters failed to satisfy their burden, under *Eagle–Picher Industries, Inc. v. Balbos*, 326 Md. 179, 604 A.2d 445 (1992), of proving that Owens–Illinois substantially contributed to Mr. Hunter's death by showing that he had been subjected to a sufficient level of asbestos exposure. Under the analytical framework described in *Balbos*, Mr. Hunter is considered a "bystander," because he was an electrician working in the vicinity of asbestos workers, but he was not directly working with asbestos. *Id.* at 210, 604 A.2d 445. *Balbos* set the bystander standard of proof as follows:

Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the work-

place and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product. In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease.

*Id.* at 210–11, 604 A.2d 445 (citations and quotation marks omitted). This has become known as the "frequent, proximate, and regular" standard, or simply the *Balbos* standard. *See also Georgia–Pacific Corp. v. Pransky*, 369 Md. 360, 800 A.2d 722 (2002) (applying *Balbos* to an asbestos bystander); *Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 526–30, 682 A.2d 1143 (1996) (same).

Owens–Illinois's argument, more specifically stated, is that while Edwards testified that Mr. Hunter was exposed "quite often" to asbestos dust, when Edwards' testimony is considered as a whole, it is so fraught with impossibilities and irreconcilable inconsistencies that, under the Court of Appeals' holdings in *York Motor Express Co. v. State ex rel. Hawk*, 195 Md. 525, 534, 74 A.2d 12 (1950), and *Kucharczyk v. State*, 235 Md. 334, 201 A.2d 683 (1964), his testimony was devoid of any probative value. Owens–Illinois asserts that because the Hunters' "entire case depends on [Edwards's] testimony," once that testimony is discredited, their case fails.

The operative principle in *York Motor Express* is uncomplicated: "[T]he court should disregard any testimony that attempts to establish something physically impossible within common knowledge and experience, or something contrary to indisputable scientific principles or laws of nature within the court's judicial knowledge." 195 Md. at 534, 74 A.2d 12. *Kucharczyk* is somewhat more complex.

In *Kucharczyk*, a mentally retarded sixteen-year-old boy testified at trial that the defendant attempted to rape him. In the course of his testimony, however, the boy also testified

that the man did not try to rape him. The two versions of his testimony were irreconcilably inconsistent on issues central to the case. Kucharczyk was convicted of assault and battery and argued on appeal that the evidence was insufficient to sustain his conviction. The Court of Appeals agreed, reasoning:

> [T]he testimony of the prosecuting witness, who was the only person that testified as to any overt act on the part of the appellant, was so contradictory that it lacked probative force and was thus insufficient to support a finding beyond a reasonable doubt of the facts required to be proven. On direct examination the boy twice testified that nothing happened in the public lavatory after the appellant gave him two drinks. On cross examination, he testified that nothing happened in the garage. Thus there were unqualified statements by the prosecuting witness that the crime for which the appellant was convicted never in fact occurred.

*Id.* at 337–38, 201 A.2d 683.

The Court then restated what has become known as the *Kucharczyk* doctrine: "When a witness says in one breath that a thing is so, and in the next breath that it is not so, his testimony is too inconclusive, contradictory, and uncertain, to be the basis of a legal conclusion." *Id.* at 338, 201 A.2d 683 (quoting *Slacum v. Jolley,* 153 Md. 343, 351, 138 A. 244 (1927), *overruled on other grounds by Harris v. Bd. of Educ. of Howard County,* 375 Md. 21, 825 A.2d 365 (2003)); *see also, e.g., U.S. Fid. & Guar. Co. v. Cont'l Baking Co.,* 172 Md. 24, 32–34, 190 A. 768 (1937).

Judge Moylan, writing for this Court in the context of a criminal case, exhaustively discussed the scope of the *Kucharczyk* doctrine in *Bailey v. State,* 16 Md.App. 83, 294 A.2d 123 (1972). We quote here, with citations omitted, the conclusions from his analysis:

> Despite the limited utility of the doctrine, the life of *Kucharczyk* has been amazing for the number of occasions on which and the number of situations in which it has been invoked in vain. *Kucharczyk* does not apply simply because

a witness's trial testimony is contradicted by other statements which the witness has given out of court or, indeed, in some other trial. Nor does *Kucharczyk* apply where a witness's trial testimony contradicts itself as to minor or peripheral details but not as to the core issues of the very occurrence of the corpus delicti or of the criminal agency of the defendant. Nor does *Kucharczyk* apply where the testimony of a witness is equivocal, doubtful and enigmatical as to surrounding detail. Nor does *Kucharczyk* apply where a witness is forgetful as to even major details or testifies as to what may seem improbable conduct. Nor does *Kucharczyk* apply where a witness is initially hesitant about giving inculpatory testimony but subsequently does inculpate a defendant. Nor does *Kucharczyk* apply where a witness appears initially to have contradicted himself but later explains or resolves the apparent contradiction. Nor does *Kucharczyk* apply where a State's witness is contradicted by other State's witnesses. Nor does *Kucharczyk* apply where a State's witness is contradicted by defense witnesses. Nor does *Kucharczyk* apply where a witness does contradict himself upon a critical issue but where there is independent corroboration of the inculpatory version. In each of those situations, our system of jurisprudence places reliance in the fact finder to take contradictions or equivocations properly into account and then to make informed judgment in assessing a witness's credibility and in weighing that witness's testimony. Even in a pure *Kucharczyk* situation, the ultimate resolution is solely in terms of measuring the legal sufficiency of the State's total case and not in terms of the exclusion of the contradictory witness's testimony.

*Id.* at 95–97, 294 A.2d 123.

More recently, the Court of Appeals has suggested that, whatever continuing vitality the *Kucharczyk* doctrine may have in criminal cases, it seems to be far less applicable in civil cases because the lower standards of proof could tolerate less consistent testimony. *Pittman v. Atl. Realty Co.,* 359 Md. 513, 547, 754 A.2d 1030 (2000); *see also* Lynn McLain, *Mary-*

*land Evidence* § 104:1 at 135–36 (2001). Nevertheless, the *Kucharczyk* doctrine is the slender reed upon which the substance of Owens–Illinois's argument relies.

Owens–Illinois's first argument under *York Motor Express* is that Mr. Hunter "could not possibly have worked on 44–foot sea and rescue craft when production of these boats did not begin until 1963." Obviously, this is merely a conflict in the evidence, not a physical impossibility within common knowledge and experience, or something contrary to indisputable scientific principles or laws of nature within the court's judicial knowledge, under *York Motor Express.* Owens–Illinois adds that "Edwards could not possibly have seen Mr. Hunter around other trades in the engine rooms of the [44–foot–long boats] because those boats did not have engine rooms large enough to house multiple trades." This is merely another conflict in the evidence, not a physical or scientific impossibility.

Owens–Illinois also argues that Edwards could not have seen or worked around Mr. Hunter in 1956 because "Edwards testified that, in 1956, he worked the second (or 3–11) shift," while Mr. Hunter "worked the first (or 7–3) shift." As Ms. Hunter points out, however, Edwards actually testified that he did not exclusively work the second shift throughout his career; when the Yard was busy, the workers alternated first and second shifts on a weekly basis. In any event, Owens–Illinois's point constitutes yet another conflict in the evidence, not testimony of a physical or scientific impossibility under *York Motor Express.*

Next, Owens–Illinois concludes that "Edwards could not possibly have seen pipecovering he knew specifically to be Kaylo used around Mr. Hunter on any basis, much less on a frequent, proximate, and regular basis." To the contrary, Edwards testified that he *did* see Mr. Hunter in Kaylo asbestos dust "quite often." Owens–Illinois stresses the implausibility of Edwards's testimony, in light of his concession that Mr. Hunter never worked as his helper, that he never saw boxes of pipe-covering in the ships' engine rooms, and

that the asbestos products produced by different manufacturers were used on all the ships interchangeably. The conflict, however, serves only to discredit or diminish the probative weight to be accorded the evidence, but not render inadmissible Edwards's testimony. In sum, Owens–Illinois has not shown any physical or scientific impossibility in the Hunters' case, as defined under *York Motor Express*.

Next, under *Kucharczyk*, Owens–Illinois argues that Edwards's testimony contained a fatal contradiction, in that he said he saw Mr. Hunter exposed to asbestos dust, but "he did not place Mr. Hunter on a specific ship that even had an engine room large enough to house multiple trades." Owens–Illinois fails to cite to any part of the record to support this argument. It appears to have come from the testimony of Owens–Illinois's expert witness, Captain Lowell, who testified, regarding the 44–foot boats being discussed, that the boats did "[n]ot really" have an engine room that one "could stand up in." In any event, Edwards's failure to specify any particular ship, in conjunction with his assertion that he saw Mr. Hunter exposed to asbestos dust, does not amount to a contradiction under *Kucharczyk*. *Cf. Slacum*, 153 Md. at 351, 138 A. 244 (For the doctrine to apply, a witness must testify "that a thing is so" and that "it is not so."). The first statement does not necessarily conflict with the second.

Next, Owens–Illinois points out that Edwards "said he never saw boxes of Kaylo pipecovering in the engine rooms of ships." This observation is (1) not a contradiction, and (2) does not go to the central issue of the case: whether Mr. Hunter was exposed to Kaylo asbestos dust on a frequent, regular, and proximate basis. The fact that Edwards may have seen Kaylo boxes only in dumpsters, and not in engine rooms, does not conflict with—and has little impact upon—his testimony that he saw Mr. Hunter exposed to asbestos dust "quite often."

Finally, Owens–Illinois again refers to Edwards's concession on cross-examination that, because so many different manufacturers' products were used at the Yard, one could not deter-

mine "which of those products happened to be on any given ship at a given time." This, Owens–Illinois asserts, irreconcilably conflicts with Edwards's statement that he saw Mr. Hunter exposed to Kaylo asbestos. To adjudge the issue properly, Edwards's testimony must be considered in the context in which the jury heard it:

[Defense counsel]: [D]o you remember telling us at your deposition that you remembered [another asbestos product called] Mansville because that name was really well known?

[Edwards]: Right.

[Defense counsel]: And that was a product that was used in great quantities down at the Coast Guard yard?

[Edwards]: Uh-huh.

[Defense counsel]: Okay. And you also told us about a product—a box that had a rooster on it. Do you remember that?

[Edwards]: Right.

[Defense counsel]: Okay. And that was a pipe-covering product?

[Edwards]: Yes.

[Defense counsel]: So we have the Kaylo, we have the Mansville, we have the Armstrong, and we have the box with the rooster on it?

[Edwards]: Kaylo had the—had the rooster on it.

[Defense counsel]: Kaylo had the rooster on it. Okay.

[Edwards]: [I] might be wrong, but I am saying that.

[Defense counsel]: In addition to those four names, were there other pipe-covering products used down at the Coast Guard yard?

[Edwards]: Not that I remember.

[Defense counsel]: Do you remember a product named Phillip Carey?

[Edwards]: No, I don't.

[Defense counsel]: There could have been other products, but you just don't—

[Edwards]: There was a lot of products we had.

[Defense counsel]: Okay. And it would be impossible to say which of those products happened to be on any given ship at a given time?

[Edwards]: No, sir, not at that time.

■ As Judge Moylan wrote in *Bailey,* "Trial testimony frequently is replete with contradiction and inconsistencies, major and minor. . . . It is . . . at the very core of the common law trial by jury . . . to trust in its fact finders, after full disclosure to them, to assess the credibility of the witnesses and to weigh the impact of their testimony." 16 Md.App. at 93, 294 A.2d 123. Owens–Illinois's argument would have us, under the auspices of *Kucharczyk,* deprive the Hunters of their right to have a jury evaluate and weigh the quoted testimony. We hold that Edwards's testimony was not so irreconcilably inconsistent as to render it devoid of any probative force. From the quoted testimony, the jury could have reasonably found that, although, as a general proposition, it was impossible to determine which product was used on which ship on any particular day, Edwards nevertheless accurately testified that he saw Mr. Hunter exposed to Kaylo dust "quite often."

Owens–Illinois does not seem to argue (at least, not with particularity), in the alternative, that even if Edwards's testimony did not run afoul of *York Motor Express* and *Kucharczyk,* the Hunters' case still fell short of the *Balbos* standard. Having waded through the record in conducting the foregoing analysis, we add that it appears that the Hunters' case did comport with *Balbos. Cf. Garrett,* 343 Md. at 529, 682 A.2d 1143; *Garlock, Inc. v. Gallagher,* 149 Md.App. 189, 210–211, 814 A.2d 1007 (holding that the "evidence, even if anemic, was worthy of jury consideration"), *cert. denied,* 374 Md. 359, 822 A.2d 1224 (2003).

## II

■ Owens–Illinois contends that the trial judge erred in rejecting its argument that "a loss of consortium claim does

not arise until the marriage is negatively impacted." The company reasons that Maryland's statutory cap on noneconomic damages must apply to the Hunters' loss of consortium damages because their marriage was negatively impacted only after the effective date of the cap.

To be sure, as a result of recent pronouncements by the Court of Appeals,[2] we could summarily dispose of this contention in a paragraph or two. These recent decisions of the Court of Appeals, however, are the products of a decade-long, arduous and contentious history of litigation during which this Court and the Court of Appeals have resisted the temptation to impinge upon the legislative prerogative in formulating a resolution of the issues regarding the application of the cap statute to claims of loss of consortium and the underlying latent injury disease. Adoption of the approach advocated by *Owens–Illinois* would have fostered ease and consistency in determining when a cause of action "arises" and would have further avoided the prospect of decisions devolving upon a "battle of the experts." Adoption of this approach, however, while attractive for the reasons stated above, would have run afoul of the express language of the relevant statute, thereby abrogating our mandate to interpret, rather than legislate. At no point during the on-going litigation, including the numerous appeals, has any party to the proceedings even obliquely suggested that the term, "arises," was subject to interpretation by Maryland courts. Indeed, the express language of the statute, unquestionably, throughout the on-going litigation, has been the proverbial "elephant in the room." But for the steadfast adherence to our proper role in our tripartite system, it is likely that the approach vehemently and persistently advocated—even in the most recent appearance before the Court of Appeals—may very well have been adopted. The ultimate recent resolution of the twin issues, i.e., application of the cap statute to claims for loss of consortium and to the underlying personal injury, represents the adoption of a mid-

---

**2.** *Owens–Illinois Inc. v. Cook,* 386 Md. 468, 872 A.2d 969 (2005) and *Crane v. Scribner, supra.*

dle-ground approach which has, as its principal benefits, considerations of fairness as to the loss of consortium claim and, of paramount import with respect to the underlying claim for personal injury, preservation of the integrity of our proper role, vis a vis, the General Assembly. We explain.

Maryland's cap on noneconomic damages in personal injury or wrongful death actions is codified at Md.Code (1998 Repl. Vol.), Cts. & Jud. Proc. (C.J.), § 11–108.[3] By the terms of the statute, if the Hunters' loss of consortium claim "arises on or after July 1, 1986," then the cap applies to their loss of consortium damages; if their claim arose before that date, the cap does not apply.

In *Scribner,* 369 Md. at 394, 800 A.2d 727, the Court of Appeals held, "In actions for personal injury founded on exposure to asbestos . . . [i]f the last exposure undisputedly was *before* July 1, 1986, § 11–108(b)(1) does not apply, as a matter of law." That is, under the cap, an asbestos-based personal injury action "arises" at the time of the plaintiff's last exposure to asbestos.

 Married couples generally have no loss of consortium claim for damages derived from personal injuries that predated their marriage. *E.g., Gillespie–Linton v. Miles,* 58 Md. App. 484, 495, 473 A.2d 947 (1984); Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 3.48 (3d ed.2004). Nevertheless, this Court has held that, for purposes of applying the statutory cap in asbestos cases,

---

**3.** Section 11–108(b) states:

   (1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

   (2)(i) Except as [otherwise provided], in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

   (ii) The limitation on noneconomic damages provided under subparagraph (i) of this paragraph shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

loss of consortium claims "arise" at the time the personal injury claim arises, even if the injury to the marriage did not actually manifest until after July 1, 1986. *Anchor Packing Co. v. Grimshaw,* 115 Md.App. 134, 166–67, 692 A.2d 5 (1997), *vacated on other grounds sub nom. by Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998). *Grimshaw* has received stringent criticism, *see* M. King Hill, III & Katherine D. Williams, *State Laws Limiting Liability for Noneconomic Damages,* 27 U. Balt. L.Rev. 317, 346–48 (1998), and Owens–Illinois contends *Grimshaw* was wrongly decided.[4]

---

**4.** The legal theory upon which *Owens–Illinois* bases its argument that the cap statute should apply to pre-marital loss of consortium latent disease claims is recapitulated in the King and Williams Article. The following provides the historical backdrop for the present controversy. Characterizing as the "implicit notion," our holding in *Grimshaw,* that loss of consortium damages constitute merely a part of the harm arising from the spouse's physical injuries, Hill and Williams posit that, for purposes of applying the cap statute, the physical injury constituted the only injury that was applicable to determining when the cause of action arose. They say, however, that we did not explicitly address the question of whether the injury to the marital unit and the spouse's personal injury are one injury or two separate injuries. They further posit that "the loss of consortium—the 'loss of society, affection, assistance, and conjugal fellowship' does not occur when the first cancer cell forms in the injured spouse's body, even though that cancer may be the injury that results in the ultimate death." The Article, analogizing the loss of consortium to a cause of action for wrongful death, claims that it would only be logical to conclude that a cause of action for loss of consortium can only arise when the marital unit experiences some injury. It is suggested that it is illogical that, under *Grimshaw,* the widow's of action for loss of consortium arose before 1986, even though the couple did not marry until 1990, and he did not experience any symptoms until 1994. Assailing the *Grimshaw* test as unworkable, Hill and Williams posit that a cause of action for loss of consortium, in some cases, "could be deemed to have occurred even before marriage took place." Decrying *Grimshaw* as having espoused a "development of disease" analysis for which the authors claim that there seems to be no objective measure, they proposed the adoption of California's "discovery of diagnosis" test, adopted in *Buttram v. Owens–Corning Fiberglas Corp.,* 16 Cal.4th 520, 66 Cal.Rptr.2d 438, 941 P.2d 71 (1997).

In *Owens Corning v. Bauman,* 125 Md.App. 454, 472–76, 726 A.2d 745 (1999), we considered the argument of Owings Corning that Maryland courts should follow the Supreme Court of California, which had adopted the *Buttram* "discovery of diagnosis" test. We pointed out that the *Buttram* decision construed a California statute, California Civil Code, § 1431.2, enacted by Proposition 51, which provided that a cause

of action for damages arising from the latent and progressive asbestos-related disease mesothelioma has "accrued," for purposes of determining whether Proposition 51 can be prospectively applied, if the plaintiff was diagnosed with the disease for which damages are sought or otherwise discovered his illness or injury prior to Proposition 51's effective date of June 4, 1968. We emphasized in *Bauman* that the *Buttram* court expressly distinguished the issue before it and before the Court of Appeals in *Owens–Illinois v. Armstrong (Armstrong II )*, 326 Md. 107, 604 A.2d 47 (1992), explaining, "At issue in *Owens–Illinois* was Maryland's statutory cap on noneconomic damages, which, by its express terms, was made applicable 'in any action for damages for personal injury in which the cause of action *arises* on or after July 1, 1986.' " 125 Md.App. at 472, 726 A.2d 745 (citing *Buttram*, 66 Cal.Rptr.2d 438, 941 P.2d at 82). We further pointed out that the *Buttram* court had noted that the Maryland Court of Appeals had

> reject[ed] [Owens–Illinois's] argument that the discovery rule, used to establish accrual in the statute of limitations context in asbestos-related latent injury cases in [Maryland] ... should likewise be utilized to determine accrual for purposes of applying the ... statutory cap, the [Court of Appeals] concluded the statutory cap did not apply to a preexisting asbestosis condition although it was not diagnosed until *after* the statute's effective date. *Id.*, 66 Cal.Rptr.2d 438, 941 P.2d at 82 (citations omitted).

125 Md.App. at 472, 726 A.2d 745.

Distinguishing Maryland Code, C.J. § 11–108(a)(2) from Proposition 51, the Supreme Court of California observed:

> Focusing on the term "arises," the court applied the rule of statutory construction that would give that term its ordinary meaning, found that a cause of action *"arises when it first comes into existence," and therefore determined that the subclinical harm to the cells and tissues of the lungs caused by the disease asbestosis during its lengthy latency period was sufficient to establish that a cause of action had "arisen" within the meaning of the statute's language.* ... Here, in contrast, Civil Code section 1431.2, enacted by Proposition 51, *contains no similar controlling language. Buttram*, 66 Cal.Rptr.2d 438, 941 P.2d at 82 (citations omitted; emphasis added).

*Bauman*, 125 Md.App. at 473, 726 A.2d 745.

The *Buttram* court, we said in *Bauman*, had distinguished the decision of the Court of Appeals in *Armstrong II* on the basis that the *Armstrong II* court had not considered "analogous policy considerations and purposes to be served in adopting an accrual rule that determines the applicability of a ... statutes such as Proposition 51." We therefore held that, as the *Buttram* court itself pointed out, resort to the diagnosis/discovery of actual injury standard, articulated in its decision, was mandated by the express language of proposition 51. 125 Md.App. at 473–74, 726 A.2d 745. Notwithstanding, as will be discussed, *infra*, the Court of Appeals has rejected the *Grimshaw* approach as "unworkable" in *John Crane, Inc. v. Scribner*, 369 Md. 369, 800 A.2d 727 (2002). It also, in the same decision, rejected the *Buttram* manifestation—diagnosis/discovery standard because it is "wholly inconsistent with the language of the [cap] statute." *Scribner*, 369 Md. at 390, 800

We rejected the theory Owens–Illinois relies upon in *Grimshaw*, and we reject it again here. In asbestos exposure cases, loss of consortium claims *do not arise at the time of their manifestation;* they arise *at the same time as the personal injury.* The trial judge did not err in concluding that the loss of consortium claim arose before the injury became manifest during the marriage; that was exactly what we held in *Grimshaw.*

Owens–Illinois characterizes this result as "an outrageous legal fiction," but this result has been sanctioned by both *Grimshaw* and *Gianotti,* both of which were reviewed and affirmed as to when the loss of consortium claim arose in *Cook, supra.* Prior to *Cook,* we had modified the rule that couples have no loss of consortium claim for injuries that predated their marriages in *Owens–Illinois v. Gianotti,* 148 Md. App. 457, 493, 813 A.2d 280 (2002).[5]

In *Gianotti,* John Gianotti was exposed to asbestos while employed as a laborer and ceiling installer between 1956 and 1974. Approximately twelve years after he was last exposed to asbestos fibers, he was diagnosed, in August 1985, with "asbestos lung disease." Less than a month before the enactment of § 11–108 of the Courts and Judicial Proceedings Article (effective July 1, 1986) and ten months after having been diagnosed with lung disease, he and Shirley Gianotti were married. The couple filed suit against various manufacturers and suppliers of asbestos containing products, including appellant, alleging that Mr. Gianotti suffered asbestos lung disease as a result of exposure to their products and, as a result of that disease, loss of consortium.

Judge Salmon, writing for this Court, engaged in an in-depth discussion of previous decisions considering application of the cap statute, vis-a-vis, when a cause of action arises and

A.2d 727. Proponents, nonetheless, continue to advocate for the adoption of the manifestation standard in Maryland.

**5.** The parties to this appeal refer to the *Gianotti* case as *"Owens–Illinois v. Cook,"* but that is not how the case is captioned in the Maryland Appellate Reports.

accrues and whether consortium is available in the case of a premarital latent injury. This Court, in *Gianotti*, citing Paul David Fasscher, *To Have and Not Hold; Applying the Discovery Rule to Loss of Consortium Claim Stemming From Premarital, Latent Injuries*, 53 Vand. L.Rev. 685 (2000), considered the concerns regarding a person marrying an injured person for the purpose of creating a loss of consortium claim:

> Where the premarital injury is latent, these threats do not exist, for it is impossible to "marry a lawsuit," or assume a risk, where the injury is unknown and unknowable at the time of the marriage. Furthermore, application of the discovery rule to loss of consortium claims stemming from latent, premarital injuries does not extend liability beyond the traditional parties. The traditional approach denying this type of claim fails to consider that equitable principles and the history of the cause of action suggest that courts should apply the discovery rule in cases of premarital, latent injuries. The discovery rule is available to rescue the underlying claim from the statute of limitations; it likewise should be available to rescue a loss of consortium claim from the traditional marriage requirement. Courts that have disagreed with this reasoning have misunderstood both the modern conception of loss of consortium and the discovery rule.
>
> The same principles that led courts and legislatures to create the discovery rule are the principles that justify application of the rule to loss of consortium claims in the premarital, latent injury context. Failure to apply the discovery rule to these claims is blind limitation of the past resulting in denial of recovery to spouses who, through no fault of their own, could not have discovered their claim until after the wedding bells rang. 57 Fordham L.Rev. 714–15.

148 Md.App. at 492, 813 A.2d 280.

Applying the foregoing reasoning, we concluded:

We agree with Fasscher and the *Stager* Court that the core reason behind the rule adopted by the common law was that a person should be prevented from profiting by a conscious decision to acquire a cause of action by marrying an injured party. We also agree with the *Stager* Court and Fasscher that neither the core reasons nor any of the other reasons behind the common law rule have any logical force when the injury was not discovered, and could not have been reasonably discoverable, at the time of the marriage.

For the foregoing reasons, we hold that for purposes of applying the common law rule enunciated in *Miles, supra*, a loss of consortium claim is barred only if, at the time the parties marry, the couple knew or reasonably should have known of the injury that formed the basis for their joint claim. We, therefore, conclude that the trial judge did not err in allowing the jury to consider the Gianottis' joint loss of consortium claim—inasmuch as it is undisputed that when the Gianottis married in 1986, his mesothelioma was neither discovered nor could it have reasonably been discoverable.

*Id.* at 493, 813 A.2d 280.

Chief Judge Bell, writing for the court in *Cook, supra*, in a well-reasoned, comprehensive opinion, traced Maryland decisions which have considered the cap statute and reviewed our decision in *Gianotti*. After setting forth our above quoted holding in *Gianotti*, the Court of Appeals analyzed the concept of loss of consortium as construed in *Anchor Packing v. Grimshaw*, 115 Md.App. 134, 692 A.2d 5 (1997), and *Oaks v. Connors*, 339 Md. 24, 660 A.2d 423 (1995).

The Court noted that it had undertaken, in *John Crane, Inc. v. Scribner*, 369 Md. 369, 800 A.2d 727 (2002), "to set the proper standard for determining when, for purposes of . . . the cap statute a cause of action for cancer or other disease based on exposure to asbestos arises." It first identified three possible approaches for determining when a cause of action arises for purposes of § 11–108(b)(1): (1) the manifestation approach, which looks to when the disease sued upon first

becomes symptomatic or diagnosed; (2) the exposure approach, which looks to when the plaintiff first inhaled asbestos fibers that caused cellular changes leading to the disease; and (3) the *Grimshaw* approach, which looks to when the disease itself first arose in the body. *Cook, supra,* 386 Md. at 482, 872 A.2d 969 (citing *Scribner,* 369 Md. at 390, 800 A.2d 727).

The manifestation approach, the *Cook* Court said, though possessed of "simplicity and certainty [and] much easier to establish when a disease was diagnosed or became symptomatic," was rejected in *Scribner* because "it flatly ignores the distinction made by the Legislature between when an action arises and when it accrues, and is therefore wholly inconsistent with the statute." *Id.* at 482, 872 A.2d 969. Although conceded by defendants in asbestos litigation, the *Scribner* Court said, "the manifestation approach would nonetheless apply the cap even when it is clear that the disease existed, and thus the cause of action based on that disease arose, prior to July 1, 1986." *Id.*

In *Scribner,* the Court recounted, it had concluded that the *Grimshaw* approach "suffers from the fact that it is impossible to apply in any uniform and rational way and necessarily engenders competing expert testimony as to the timing of an event that no one can precisely define." *Scribner,* 369 Md. at 391, 800 A.2d 727. The Court concluded that Grimshaw was not a workable approach.[6]

Because it presented the fewest significant problems and was most consistent with the statutory language, the *Scribner* Court ultimately settled on the exposure approach, explaining:

> The exposure approach is consistent with our holdings in *Mitchell[ v. Maryland Casualty Co.,* 324 Md. 44, 595 A.2d 469 (1991) ] and *Murphy v. Edmonds,* 325 Md. 342, 601 A.2d 102 (1992), and, if carefully delineated, is both theoretically supportable and workable. It rests, initially, on the premise that there is, in fact, an injury. If there is no

---

**6.** This is one of the principal objections to the *Grimshaw* approach raised in the law review article, *State Laws Limiting Liability for Non Economic Damages,* and by *Owens–Illinois.*

injury, there is no cause of action. Thus, it need not attempt to address the problem of entirely inconsequential exposures or exposures that produce only pleural plaques or other conditions that, absent more, do not constitute injuries, which seems to have plagued the Court of Special Appeals, for, if that is all that the plaintiff has, no cause of action exists and § 11–108(b)(1) never comes into play. We start, then, with the requisite premise that the plaintiff has established to the satisfaction of the trier of fact that he or she has an injury that was proximately caused by exposure to the defendant's asbestos-containing product. Whether the injury sued upon is cancer or asbestosis, the plaintiff must, at the outset, establish that he or she has that disease and that it was caused, in whole or substantial part, by exposure to the defendant's asbestos-containing product. The question, for purposes of § 11–108(b)(1), is when that injury came into existence.

*Id.* at 391–92, 800 A.2d at 740. We held, *inter alia:* in actions for personal injury founded on exposure to asbestos, the court, as an initial matter, may look, for purposes of § 11–108(b)(1), to the plaintiff's last exposure to the defendant's asbestos-containing product. If that last exposure undisputedly was *before* July 1, 1986, § 11–108(b)(1) does not apply, as a matter of law.

*Cook,* 386 Md. at 468, 872 A.2d 969 (citing *Scribner,* 369 Md. at 390, 800 A.2d 727).

Thus, the Court held that, "in actions for personal injury from exposure to asbestos, the [trial] court, as an initial matter, may look, for purposes of § 11–108(b)(1), to the plaintiff's last exposure to the defendant's asbestos-containing product. If that last exposure undisputedly was before July 1, 1986, § 11–108(b)(1) does not apply, as a matter of law." *Cook,* 386 Md. at 468, 872 A.2d 969 (citing *Scribner,* 369 Md. at 391–92, 800 A.2d 727). Notwithstanding the holding in *Scribner,* Owings–Illinois persisted, before the *Cook* Court, in its advocacy that the manifestation standard should apply to the loss of consortium claim because, it avers, the damages

sought in that claim differ from those sought in the underlying personal injury claim.

The Court of Appeals, in *Cook*, summarized the position advanced by Owens–Illinois. The Court noted that, notwithstanding that Owens–Illinois was cognizant of its holding in *Scribner*, as well as its effect in rendering the cap applicable to the Respondent's personal injury, it nevertheless urged a different result with respect to its loss of consortium claim, arguing that the proposed result was "required by the nature of the action and by [our] cases." Petitioner, continued the Court, citing *Oaks v. Connors*, 339 Md. 24, 660 A.2d 423 (1995), insisted that because such a claim "arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party, a loss of consortium claim does not and cannot 'arise' until the marriage is negatively impacted by one spouse's underlying personal injury."

In support of its position in *Cook*, Owens–Illinois had relied upon *Phipps v. General Motors Corp.*, 278 Md. 337, 354, 363 A.2d 955, 964 (1976); *Travelers Indem. Co. v. Cornelsen*, 272 Md. 48, 51, 321 A.2d 149, 150 (1974); and *Exxon Corp. v. Schoene*, 67 Md.App. 412, 423, 508 A.2d 142, 148 (1986). Arguing that a different trigger applies to a loss of consortium claim, *Owens–Illinois* contended that the causes of action are separate, citing P. Sandler and J. Archibald, *Pleading Causes of Action* (2nd ed.1998 and Supp.2004) § 3.48 at 319–20; G. Shadoan, *Maryland Tort Damages* (4th ed.1994) at 21–22; R. Bell, *Maryland Civil Jury Instructions and Commentary* § 18.11 at 415 (Michie 1993 and Supp.1996). The *Cook* Court then noted that petitioner had maintained its position, despite the fact that the loss of consortium claim and personal injury claim underlying it were intertwined and that a single cap applies to both.

The Court of Appeals further summed up the position of Owens–Illinois in attempting to circumvent *Grimshaw's* holding that, in the context of the cap statute, a loss of consortium

claim involving a latent disease arises at the same time as the predicate personal injury claim. Petitioner had also maintained that *Grimshaw* is neither persuasive nor dispositive "because although [the Court of Appeals] in *Scribner* overruled *Grimshaw* on the issue of when a personal injury claim arises, it is not clear whether *Grimshaw's* holding as to when the underlying personal injury arises—is still good law." According to the *Cook* opinion, *Owens–Illinois* further pointed out that *Grimshaw* cited *Oaks* for the proposition that "loss of consortium is not a separate action from the predicate personal injury, even though [the Court of Appeals], in *Oaks*, did not disturb the Court of Special Appeals' statement in its opinion." The statement to which *Owens–Illinois* had alluded in *Connors v. Oaks*, 100 Md.App. at 549, 642 A.2d 245, was:

An action for personal injuries and a claim for loss of consortium are separate causes of action. . . . The plaintiffs in each action are different—the physically injured spouse has an individual claim in the action for personal injuries, and the husband and wife jointly have a claim for loss of consortium.

The *Cook* Court's recapitulation of the position of *Owens–Illinois* concluded: Petitioner urges, at most, a reconsideration of *Grimshaw*. *Cook*, 386 Md. at 486, 872 A.2d 969.

Citing *Deems v. Western Maryland Railway Company*, 247 Md. 95, 115, 231 A.2d 514 (1967), the Court of Appeals pointed out that a claim for the loss of consortium can only be asserted in a joint action, tried at the same time as the individual action of the physically injured spouse, for injury to the marital relationship. There is, the Court said, "a continuing marital relationship, an inseparable mutuality of ties and obligations, of pleasures, affection and companionship which makes a relationship a factual entity." *Id.* at 108, 231 A.2d 514. The Court further observed that the negligence of the defendant, where there is a claim of loss of consortium, "directly affects the entity through its member who sustains the physical injury." *Mahnke v. Moore*, 197 Md. 61 (1951). The Court

then recalled its explication of the effect on the loss of consortium in *Oaks:*

> The pain, suffering, and depression that are personal to the injured victim will inevitably affect the relationship with that person's spouse. Whether these injuries are claimed individually, by the marital unit, or by both, however, they constitute noneconomic damages flowing from a single source, the tortious injury to the victim spouse.

*Cook,* 386 Md. at 489, 872 A.2d 969 (citing *Oaks,* 339 Md. at 37, 660 A.2d 423).

In concluding that "[a] loss of consortium claim is derivative of the injured spouse's claim for personal injury," *id.* at 38, 660 A.2d 423; *Okwa v. Harper,* 360 Md. 161, 176, 757 A.2d 118 (2000); *Klein v. Sears, Roebuck and Co.,* 92 Md.App. 477, 493, 608 A.2d 1276 (1992), the Court explained: "When a physical injury results to a married person as a result of someone else's tortious conduct, two injuries may arise: (1) the physical injury to the spouse who was directly injured by the tortious conduct and (2) the derivative loss of society, affection, assistance, and conjugal fellowship to his or her spouse."

Having delineated the derivative nature of a loss of consortium claim, the Court, citing *Gianotti,* 148 Md.App. at 485, 813 A.2d 280, then turned to the general rule that had been Maryland law, i.e., that such a claim does not lie for an antenuptial tort. The two principal rationales relied upon for requiring that the parties be married at the time of injury were: (1) to prevent an individual from making a conscious decision to acquire a cause of action by marrying an injured party and (2) to recognize the premise, accepted as a condition of marriage, that one spouse takes the other in his or her then-existing state of health and assumes the risk of any deprivation resulting from prior disability. *Furby v. Raymark Industries, Inc.,* 154 Mich.App. 339, 397 N.W.2d 303, 305 (1986); *Rademacher v. Torbensen,* 257 A.D. 91, 13 N.Y.S.2d 124 (1939). The third rationale, noted by the Court, is that, as a matter of social policy, there should be limits on tort liability. *Stager v. Schneider,* 494 A.2d 1307, 1315 (D.C.App.

1985) (citing *Tong v. Jocson,* 76 Cal.App.3d 603, 142 Cal.Rptr. 726, 727 (1977)).

The Court of Appeals then pointed out that it is only when an injury is latent and, therefore, could not reasonably have been discovered prior to the marriage, that the issue becomes problematic, leading different courts to reach different results. The Court then concluded that because there was no marital relation between the parties, there was no cause of action within the period of limitations, and thus implementation of the discovery rule does not result in an abuse of either of the three undesirable consequences of allowing claims for prenuptial latent injuries. Consequently, the discovery rule cannot create a cause of action where none had ever existed during the period of limitations.

The Court of Appeals ultimately found persuasive the reasoning employed in *Stager v. Schneider, supra,* and *Green v. A.P.C. (American Pharmaceutical Co.),* 136 Wash.2d 87, 960 P.2d 912 (1998).

Quoting generously from *Green,* the *Cook* Court, 386 Md. at 493, 872 A.2d 969, pointed out that the Supreme Court of Washington had

rejected the three common rationales for the marriage requirement, (1) a person should not be permitted to marry a cause of action; (2) one assumes with a spouse the risk of deprivation of consortium arising from any prior injury; (3) as a matter of policy, tort liability should be limited. *Id.* at 918, citing *Stager,* 494 A.2d at 1315–1316. Submitting that the rationales for the majority rule do not take account of the circumstance in which the injury to the affected spouse is latent and unknown, in the context of that case, the court explained why they did not apply:

Joshua Green could not have married a lawsuit in 1988 if Kathleen herself did not know then she had a T-shaped uterus that would cause her to have difficult pregnancies. The 'assumption of risk' rationale suffers from the same defect. One cannot assume a risk one does not and cannot know about.... The third rationale is also weak;

> it is surely foreseeable that a future spouse or close relative might suffer loss of consortium damages. The class of potential plaintiffs is therefore quite limited, confined to those who might some day be in consortium with an injured party. Thus, allowing such claims does not expose a tortfeasor to unbounded liability.

*Id.* at 918–19 (citation omitted). The court then offered a better reason, opining [t]he best argument for rejecting the majority rule, however is its fundamental unfairness in the toxic exposure context: loss of consortium damages should be available for a premarital injury if the injured spouse either does not know or cannot know of the injury. *Id.* at 919.

The Court of Appeals, in rejecting the position of Petitioner Owens–Illinois, ultimately held:

> When the Gianottis married, it is undisputed that Mr. Gianotti's mesothelioma had not been diagnosed. More importantly, it is also undisputed that the parties to the marriage neither knew, nor reasonably could have known, of the injury that formed the basis for the joint claim. We agree with *Green* that it would be fundamentally unfair not to permit the loss of consortium claim in this context and, like the intermediate appellate court, we are persuaded by *Stager* and its progeny, that, where "neither the wrongful conduct nor the fact of injury was known prior to marriage," a cause of action for loss of consortium as to which the underlying injury is a premarital one, accrues when the injury is discovered, or reasonably discoverable. The loss of consortium claim was properly submitted to the jury.
>
> . . . .
>
> Under the circumstances, and for these reasons, therefore, we agree with the respondents: it is illogical to impose a cap on non-economic damages in a loss of consortium claim where loss of consortium is not a separate action for injury to the marriage entity and the personal injury cause of

action from which it derives is not itself subject to the cap statute.

*Cook*, 386 Md. at 494–95, 872 A.2d 969.

The *Cook* decision addresses squarely the loss of consortium issue raised by appellant. It lays to rest the recurrent theme raised by appellant regarding what it perceives to be the flawed reasoning of *Grimshaw* as to when a personal cause of action "arises" and it adopts the more reasonable approach to the application of the cap statute to a claim for loss of consortium when an injury arises in the context of a latent injury. The disposition, we think, avoids the prospect of enterprising would-be spouses, looking to marry into a cause of action, while not penalizing claimants and their spouses who could not have known of the impending infirmity. To sum up, the *Cook* Court, although rejecting the *Grimshaw* test, reaffirmed that Maryland has taken the middle ground, consistent with the express language of the statute, with respect to when a latent disease "arises." In adopting the "exposure approach," affirming *Grimshaw and Scribner,* and rejecting the argument of *Owens–Illinois* that the causes of action for consortium and the underlying personal injury are separate and distinct, the Court has likewise eschewed precluding loss of consortium claims where parties to the marriage did not know and could not have known of the injury that forms the basis of the joint claim.

We can only hope that the comprehensive and exhaustive chronology of the evolution of the law regarding the cap statute, and the disposition by Chief Judge Bell, writing for the Court, be a post mortem and bring to an end the ongoing saga of the cap statute. Patently, the case *sub judice* is controlled by the recent decision handed down by the Court of Appeals in *Cook.* The lower court properly determined that the cap statute did not apply to appellant's loss of consortium claim.

## III

Owens–Illinois next argues that the Hunters' loss of consortium claim cannot stand because, regardless of the cap and its

triggering dates, the Hunters married into their loss of consortium claim. The Company acknowledges that we have decided this issue against it in *Gianotti*, and that *Gianotti* mandates that we reject the argument. As we have discussed in Section II, *supra*, the Court of Appeals has issued its decision in *Cook*, *supra*, which is dispositive of the issue.

### IV

■ Ms. Hunter, as cross-appellant, argues that the circuit court erred in granting Owens–Illinois's motion for remittitur. Specifically, Ms. Hunter argues that a trial judge may not grant remittitur based upon a disparity between damages awarded for loss of consortium and damages awarded in a related survival action for personal injury. That disparity, she argues, is an impermissible consideration.[7]

In the trial judge's memorandum opinion, he explained his decision to grant remittitur as follows:

Having heard the testimony and then having noted the jury verdict in the survival action, ($5,000 [ ] for economic loss of household services and $10,000 [ ] for non-economic loss) the court believes that a verdict of $2,000,000 [ ] is out of all proportion to the amount awarded in the survival action. Contrary to the argument of plaintiff's counsel, both the survival action and the damage to the marital relationship action cease at the time of death of the plaintiff. Therefore, there ought to be some relationship between the two figures. If the jury felt that a total of $15,000 [ ] was an appropriate award for the pain and suffering, and the other elements that go to make up a damage award in a survival action, then $2,000,000 [ ] for the damage to the marital relation is grossly excessive.

Ms. Hunter agreed to remit $1 million of the $2 million consortium award.

---

7. Ms. Hunter does not submit a "fall-back" argument that, if that disparity is a permissible factor for the judge's consideration, the judge in this case nevertheless abused his discretion in concluding that remittitur was appropriate.

■■ Under Maryland Rule 2–533, trial judges have broad discretion to grant conditional new trial motions, requiring prevailing plaintiffs to agree to remittitur or face new trial. *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 449, 601 A.2d 633 (1992). Summarizing the varying formulations of the standards trial judges should apply in considering remittitur motions, the Court of Appeals has said:

> [I]t is for the trial judge to determine whether a verdict "shocked his conscience," was "grossly excessive," or merely "excessive." ... [A]ll of these formulae mean substantially the same thing, ... that the damages are "such as all mankind must be ready to exclaim against, at first blush," being used to indicate the trial judge should extend the fullest consideration possible to the amount returned by the jury before it concludes that it shocks his conscience, is "grossly excessive" or is "excessive."

*Conklin v. Schillinger*, 255 Md. 50, 69, 257 A.2d 187 (1969) (citations omitted). We will not disturb a trial judge's remittitur decision except in cases of an abuse of discretion. *Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969 (1988); *Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md.App. 18, 78–81, 818 A.2d 1159 (2003), *aff'd*, 379 Md. 249, 841 A.2d 828 (2004); John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland Civil Procedure* § 10.3(c) (2d ed.2004).

In *Conklin*, 255 Md. at 70, 257 A.2d 187, the Court of Appeals held, at least implicitly, that one of the factors judges may consider in evaluating remittitur motions is the proportional relationship between noneconomic personal injury damages awarded and the compensatory damages deriving from the same injury. In *Bowden v. Caldor, Inc.*, 350 Md. 4, 39, 710 A.2d 267 (1998), the Court held that another factor judges should consider, when punitive damages are awarded, is the balance between the punitive damages and the compensatory damages.

Ms. Hunter argues that the disparity between Mr. Hunter's personal injury damages in the survival action and damages awarded for the couple's loss of consortium claim is an imper-

missible consideration, because the two causes of action are distinct and damages awarded in each action remedy different injuries. Owens–Illinois counters that Ms. Hunter's theory is at odds with what the Court of Appeals said in *Oaks v. Connors*, 339 Md. 24, 37, 660 A.2d 423 (1995), in which the Court held that a single cap on noneconomic damages applies to both personal injury damages and the derivative consortium damages:

> [T]he [plaintiffs] assert that, although they must be adjudicated concurrently, a claim for loss of consortium by the marital unit is separate and distinct from any claim made by the injured spouse and, therefore, should have its own cap. We believe that damages to a marital relationship are frequently inextricably intertwined with the harm sustained by the injured spouse. As we held in *Deems* [*v. Western Maryland Railway*,] "marital interests are in reality ... interdependent [and] injury to these interests is ... essentially incapable of separate evaluation as to the husband and wife." 247 Md. [95,] 109, 231 A.2d 514 [(1967)]. For example, the pain, suffering, and depression that are personal to the injured victim will inevitably affect the relationship with that person's spouse. Whether these injuries are claimed individually, by the marital unit, or by both, however, they constitute noneconomic damages flowing from a single source, the tortious injury to the victim spouse.

(Omissions in *Oaks* ). In light of the interdependence between personal injury actions and derivative consortium claims, and given that the Court has already held, in *Conklin*, that comparison may be made between noneconomic personal injury damages and compensatory damages, and in *Bowden*, that comparison *should* be made between punitive and compensatory damages, we are not prepared to hold that trial judges are wholly barred from considering the proportional relationship between personal injury damages and consortium damages in granting a remittitur motion.

## V

■ Finally, Ms. Hunter argues that the trial judge improperly applied the noneconomic damages cap to her wrong-

ful death claim. She asserts that the wrongful death claim did not "arise," for purposes of the cap, when Mr. Hunter died, but rather, it arose at the time of Mr. Hunter's last exposure to asbestos dust.

We previously resolved this issue in *Grimshaw*, 115 Md. App. at 154–55, 692 A.2d 5. In that case, the appellants' first question presented for our review was whether "the statutory cap on noneconomic damages ... appl[ied] to plaintiffs' claims for wrongful death, loss of consortium, and personal injury damages resulting from exposure to asbestos." Regarding the wrongful death action, we held: "Each wrongful death action arose when the plaintiff's spouse died, which was after October 1, 1994, the effective date of the statutory cap [as to wrongful death actions]. Therefore, the statutory cap on noneconomic damages for wrongful death is applicable." *Id.; see also Scribner*, 369 Md. at 375 & n. 2, 800 A.2d 727 (because an essential element of a wrongful death action is the death of the person, and it was undisputed that Mr. Scribner died after October 1, 1994—the effective date of the cap on non-economic damages awarded in a wrongful death action—there was no dispute but the cap applied to the wrongful death action). Accordingly, the trial judge committed no error in applying the cap to Ms. Hunter's wrongful death action.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE.**